**Bradford Jason LEWIS**

v.

**NEWSCHANNEL 5 NETWORK, L.P., et al.**

Court of Appeals of Tennessee, at Nashville.

June 27, 2006 Session.

May 31, 2007.

Permission to Appeal Denied by Supreme Court Sept. 17, 2007.

Robert L. DeLaney, Nashville, Tennessee, for the appellant, Bradford Jason Lewis.

Jon D. Ross and Ronald G. Harris, Nashville, Tennessee, for the appellees, NewsChannel 5 Network, L.P., Deborah Turner, Mike Cutler, and Phil Williams.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J., and DAVID H. WELLES, Sp. J., joined.

This appeal involves a television news story about the discipline of a high ranking official of the Metropolitan Nashville Police Department who interceded with a subordinate to prevent his brother-in-law's arrest. Following the broadcast, the police official and his brother-in-law filed separate lawsuits against the television station and three of its employees in the Circuit Court for Davidson County seeking damages for libel and false light invasion of privacy. The television station and its employees filed a motion for summary judgment based on the common-law fair report privilege and on its defense that the heightened "actual malice" burden of proof applied to all claims. In response, the

police official's brother-in-law asserted that he should not be held to the "actual malice" standard because he was a private person and because the news story involved a matter of purely private concern. The trial court granted the summary judgment and dismissed the complaints filed by the police official and his brother-in-law. With specific regard to the police official's brother-in-law, the court determined that the television station and its employees were shielded by the fair report privilege. It also concluded that the police official's brother-in-law was not a public figure for the purpose of his libel claim but that he had failed to demonstrate that he would be able to carry his burden of proof to establish a simple negligence claim against the television station and its employees. The court also concluded that the actual malice burden of proof applied to the false light invasion of privacy claim and that the police official's brother-in-law had failed to establish that the television station and its employees had acted with actual malice. Only the police official's brother-in-law appealed. He asserts that the trial court erred by applying the fair report privilege and by concluding that he could not successfully prove that the television station and its employees had been negligent in their investigation and broadcast of the news story. We have determined (1) that the trial court erred by holding that the fair report privilege applies in this case; (2) that the police official's brother-in-law is a limited purpose public figure and, therefore, cannot recover damages unless he can prove that the television station and its employees acted with actual malice; and (3) that the police official's brother-in-law cannot prove that the television station and its employees acted with actual malice

in the investigation and broadcast of the news story.

## I.

Sometime in early 2000, Phil Williams, an investigative reporter for NewsChannel 5, a television station located in Nashville, began receiving tips about the alleged misconduct of members of the Metropolitan Nashville Police Department ("Department"). Mr. Williams discussed these tips with Mike Cutler, NewsChannel 5's news director. They decided that Mr. Williams should follow up on the most credible tips. Major Carl Dollarhide, the Commander of the Patrol Division, soon became the focus of the investigation. Eventually News-Channel 5 broadcast four stories about Major Dollarhide.

Mr. Williams's first news story was broadcast on July 11, 2000. It described the close personal relationships between Jimmy Lewis and Major Dollarhide and other high ranking police officials. The story stated that Department rules prohibited officers from associating with convicted felons or persons connected with criminal activity. It pointed out that Jimmy Lewis[1] had pled guilty to a federal gambling charge in 1991. It also pointed out that Jimmy Lewis was the lessee of record for a number of buildings in Nashville housing popular restaurants, as well as a number of sex shops and strip clubs.

The July 11, 2000 news story questioned the propriety of Officer Herb Kajihara, a vice officer, arranging for off-duty police officers to provide security for special events at Jimmy Lewis's restaurants. Part of the story included video footage of Jimmy Lewis having lunch with Major Dollarhide and other high ranking police officers. The story indicated that the

1. Both Jimmy Lewis and his son, Brad Lewis, figure prominently in the facts of this case. To avoid confusion, they will be referred to as "Jimmy Lewis" and "Brad Lewis" respectively.

rules relating to non-work related contact might not apply to Major Dollarhide's relationship with Jimmy Lewis because Major Dollarhide was married to Jimmy Lewis's daughter[2] and because Jimmy Lewis was the grandfather of Major Dollarhide's child.

The second news story aired on July 12, 2000. In this story, Mr. Williams focused on the cozy relationship between Major Dollarhide, Jimmy Lewis, the Printer's Alley Merchants Association, and other downtown nightclub owners. Jimmy Lewis had financial interests in a number of these businesses. When regular police officers began responding to complaints involving various downtown clubs, including those in Printer's Alley, they encountered resistance from the off-duty police officers who had been hired to provide security for the clubs.[3] In a televised interview, Captain Joey Bishop stated that Major Dollarhide had arranged a meeting between him and the club owners. Captain Bishop also stated that Major Dollarhide later instructed him to lay off of certain establishments and to deploy his officers elsewhere.

Mr. Williams's third news story about Major Dollarhide aired during the 10:00 p.m. news on July 25, 2000. This story focused on Major Dollarhide's intercession on behalf of his "long-time friend," Charles King. The story focused on a run-in between Mr. King and the police. It reported that Mr. King had been stopped for reckless driving and that the officer had found a pistol under the front seat of his vehicle. Mr. Williams reported that Mr. King's lawyer, Bryan Lewis, was one of Jimmy Lewis's sons and also Major Dollarhide's brother-in-law. He stated that

Major Dollarhide had allegedly applied pressure on the arresting officers to drop the charges against Mr. King. Mr. Williams also reported that the prosecutor's file contained a written note that officers had reported that "a police major has been applying pressure to get the case dropped." District Attorney General Victor S. Johnson III confirmed in an on-camera interview that "[w]e felt there was enough merit to at least refer it out, so it was looked at by an outside agency. To go beyond that, I don't think I can." Mr. Williams also reported that an active investigation had begun within the police department's internal affairs division to determine whether any departmental rules had been violated.

By the time Mr. Williams arrived at work on July 26, 2000, there were two anonymous messages on his hotline. These messages involved yet another incident involving Major Dollarhide. The tipsters, who identified themselves only as police officers, claimed that Major Dollarhide had also acted to prevent the arrest of Brad Lewis, Jimmy Lewis's son. During the day, Mr. Williams received a third telephone call from a police officer regarding the Brad Lewis incident. The caller stated that he preferred to remain anonymous because he feared for his job and his safety. He told Mr. Williams that Brad Lewis had been stopped at a roadblock on the Ashland City Highway that had been set up following a prison escape. He also told Mr. Williams that the officer who stopped Brad Lewis found a sawed-off shotgun, a bag containing gambling slips, and a significant amount of cash in Mr.

**2.** Major Dollarhide and his wife were divorced in January 2000. However, as far as this record shows, they were married at all times relevant to the issues in this case.

**3.** For example, an off-duty officer asked a police lieutenant not to issue a citation to Lonnie's Carousel Club which was located in premises leased from Jimmy Lewis. A similar situation arose at the Music City Mix Factory.

Lewis's pickup truck. The caller also told Mr. Williams that Major Dollarhide had intervened to ensure that Brad Lewis, his brother-in-law, would not be arrested.

When Mr. Williams asked the caller how this information could be corroborated, the caller suggested that "Officer Dunn" would be a good person to contact. He also stated that he did not know how to contact Officer Dunn. Mr. Williams did not know Officer Dunn, but he was able to discover his full name—Michael Dunn—along with his home address. Accordingly, Mr. Williams decided to have a face-to-face conversation with Officer Dunn rather than talking with him by telephone.

Mr. Williams drove to Officer Dunn's house and found Officer Dunn and his wife working outside. When Officer Dunn approached Mr. Williams and asked whether he needed any help, Mr. Williams identified himself as a reporter and told Officer Dunn about the information he had received regarding Brad Lewis and Major Dollarhide. Officer Dunn was not pleased to have a television reporter at his home and was reluctant to talk about the incident that had occurred two years earlier on December 27, 1998. Eventually he hesitantly agreed to listen to the information that Mr. Williams had received, to correct any erroneous information, and to provide additional elaboration when it was needed.

After Mr. Williams recounted the information he had received, Officer Dunn stated that he was certain that Brad Lewis had been in possession of gambling slips, an estimated $24,000 in cash, and a sawed-off shotgun. He concurred with most of the information Mr. Williams had already received except one detail involving Jimmy Lewis. The anonymous caller had told Mr. Williams that Jimmy Lewis was with Major Dollarhide when Major Dollarhide picked up Brad Lewis. Officer Dunn stated that Jimmy Lewis did not come to the scene with Major Dollarhide. Officer Dunn also stated that he met Jimmy Lewis later that night when he turned over the bag containing the cash to Major Dollarhide. Finally, Officer Dunn told Mr. Williams that Jimmy Lewis had offered to buy him and his wife "a steak dinner ... or some sort of dinner at one of his restaurants."

Mr. Williams asked Officer Dunn for corroboration of his account of the incident involving Brad Lewis. Officer Dunn suggested that Mr. Williams should listen to the police dispatch tapes and also noted that a news crew had been covering the prison escape from a nearby bridge. Officer Dunn explained that, because of the news crew, he had turned Brad Lewis over to Major Dollarhide at another location out of the news crew's view. Mr. Williams's conversation with Officer Dunn lasted approximately ten minutes. It ended, at least in part, because Officer Dunn was uncomfortable discussing the incident any further.

Following his conversation with Officer Dunn, Mr. Williams found the news footage of the road block on the Ashland City Highway. He also requested the Department provide information about any traffic stops that were made on the day of the incident and requested the tapes of the police department's audio recordings. The Department's public affairs manager provided Mr. Williams one recording that included a reference to Officer Dunn's stop of a white male possessing a firearm at a roadblock. He also informed Mr. Williams that other tapes were being held by Detective Ron Carter, an investigator with the Office of Professional Accountability, as part of an investigation and that they would be made available at some point.

One of Mr. Williams's confidential sources eventually permitted him to listen to the audio tapes that had been withheld.

On the tapes, Major Dollarhide can be heard expressing surprise when he is informed that Brad Lewis was found with three firearms in his possession. Major Dollarhide can also be heard telling the dispatcher, "I'll go get him [Brad Lewis]. I know the kid. Hell, I don't want the kid to get arrested." Major Dollarhide later tells the dispatcher to contact the officer at the scene and "tell him to give me ten minutes, and I'll be up there." Mr. Williams did not hear anything on the tapes that contradicted the information received from Officer Dunn or the three anonymous callers.

Apparently Major Dollarhide had not retrieved the bag containing the money and gambling slips when he retrieved Brad Lewis. The tapes revealed a number of communications later in the evening between Major Dollarhide and the dispatcher and the booking room in which Major Dollarhide was trying to locate Officer Dunn. When the dispatcher informed Officer Dunn that Major Dollarhide was trying to locate him, Officer Dunn can be heard on the tape asking the dispatcher to inform Major Dollarhide that "I've got the item that was left in that car if he could leave me a voice mail message on my pager, I could return it to him."

On August 9, 2000, while Mr. Williams was trying to obtain copies of the tapes for use in his story, the Department issued a press release stating that Major Dollarhide had been "disempowered" based on an incident that had occurred in December 1998. The press release stated:

> Chief Emmett Turner today placed Major Carl Dollarhide on administrative leave and ordered him to surrender his police credentials and weapon (disempowered) as the result of serious allegations regarding improprieties on the part of Dollarhide in December, 1998. Chief Turner's action follows investiga-

tion of the allegations by the police department's Office of Professional Accountability over the past month. Chief Turner has been in consultation with the District Attorney's office about this matter, and, at present, is unable to publicly discuss the on-going investigation which is both internal and criminal in nature.

> "Allegations of impropriety against any member of the police department will be taken seriously and thoroughly investigated," Chief Turner said. "If matters need to be referred to other entities for investigation, so be it. I am determined to get to the bottom of alleged wrongdoing for the betterment of this department and the city."

Dollarhide has commanded the police department's Patrol Division since October 1, 1989, the date he was promoted to the rank of major. Prior to becoming a major, Dollarhide was the captain over south sector patrol officers. Dollarhide was employed by the police department on October 1, 1962. He was promoted to sergeant in 1969, to lieutenant in 1973 and to captain in 1985.

Dollarhide's disciplinary record reflects a one-day suspension in 1972 for an at-fault accident in a police vehicle.

As far as this record shows, the Chief of Police did not hold a press conference in conjunction with the issuance of this press release and made no other public statements regarding the details of the "serious allegations" regarding Major Dollarhide's "improprieties," the status or results of the Office of Professional Accountability's investigation, or his conversations with the District Attorney General.

Following the announcement of Major Dollarhide's disempowerment, Mr. Williams and his superiors at NewsChannel 5 decided to broadcast a story about Major Dollarhide's intervention to prevent Brad Lewis from being arrested in Decem-

ber 1998. However, before broadcasting the story, Mr. Williams called Major Dollarhide for a comment. Major Dollarhide did not return the call. Mr. Williams also called Brad Lewis who did not deny the facts but instead threatened to kill Mr. Williams. Mr. Lewis later telephoned Mr. Williams and provided him, via email, a picture of himself for use in the story. Mr. Williams used the picture during the broadcast of the 10:00 p.m. news.

The story that NewsChannel 5 broadcast on its 10:00 p.m. news on August 9, 2000, stated:

Tonight.... A NewsChannel 5 investigation is shaking up the Metro Police Department. One of its highest-ranking officers has been stripped of his power. Our Phil Williams has evidence that a police major interfered with an investigation. Phil?

MR. WILLIAMS: And because of what we found, the major himself is under investigation tonight. For weeks, we have shown you allegations that Major Carl Dollarhide ordered officers to ease up on certain nightclubs. He said it wasn't true. Then, we reported that officers say he pressured them to drop charges against one of his buddies. Again, the major denied it. Now, we've uncovered evidence that Major Dollarhide intervened to keep the son of a convicted gambler from being arrested. This time, it was caught on tape.

December 27, 1998. Metro Police blanket northwest Davidson County after six inmates escape from prison. Here, at a roadblock on the Ashland City highway, one vehicle raises the suspicions of a rookie officer. Over the police radio, the officer indicates that the driver is heavily armed—in police

lingo, 10–54—and he cannot prove who he is.

SOUND FROM POLICE RADIO: "I've got a male white with no ID and he's 54."

MR. WILLIAMS: The driver it turns out is Brad Lewis, the man you see here behind the wheel of this black pickup. He's the son of a convicted gambler Jimmy Lewis. Inside Brad Lewis' vehicle, according to individuals familiar with the case, officers spotted paper sacks with hundreds—maybe thousands—of dollars in cash, along with what appear to be betting slips.

Police say there's also a sawed-off shotgun like this one [4]—and two other weapons.

After a dispatcher calls Brad Lewis' girlfriend to ask her to bring his driver's license to the scene, the dispatcher gets a call from this man—Major Carl Dollarhide.

Dollarhide oversees the patrol division and is longtime friends with Jimmy Lewis. At the time, the police major was married to Jimmy Lewis' daughter ... making Brad Lewis his brother-in-law.

Tape recordings from police dispatch indicate that Dollarhide tells the dispatcher: "I'll go get him"—referring to Brad Lewis—"I know the kid. Hell, I don't want the kid to get arrested."

Later, he instructs the dispatcher to "Tell him"—referring to the officer—"to give me 10 minutes, and I'll be up there."

A few minutes later, Dollarhide arrived at the roadblock, and according to those familiar with the case, pressured the officer to release Brad Lewis with-

---

**4.** The sawed-off shotgun image that was presented was undisputedly not the sawed-off shotgun that has been alleged to have been found in Brad Lewis's possession at the scene of the incident.

out filing any criminal charges. Lewis was not arrested.

MS. KENNETHA SAWYERS: "Any time criminal conduct is alleged we regard that as extremely serious."

MR. WILLIAMS: After News Channel 5 requested the tapes of Dollarhide's phone call, Kennetha Sawyers' internal affairs unit began its own internal investigation of this incident, involving the police major. Now, the district attorney's office has asked that those tapes be held as evidence of a crime.

MS. SAWYERS: "We are anticipating some criminal charges from the DA's office, although that decision is not made by our office."

MR. WILLIAMS: Chief Turner ordered Major Dollarhide to surrender his gun and badge today and placed him on administrative leave with pay pending the outcome of the investigation. Dollarhide did not return my phone call. As for Brad Lewis, he told me today, "If I ever find you out anywhere, I'll kill you." Tonight, we have reported that threat to the authorities.

Mr. Williams's report ended with a quote from the Chief of Police Emmett Turner's statement in the Department's press release: "Allegations of impropriety against any member of the Police Department will be taken seriously and thoroughly investigated."

Shortly after the August 9, 2000 broadcast, Brad Lewis retained a lawyer who sent NewsChannel 5 a letter demanding a written retraction. The letter prompted Mr. Williams to contact Officer Dunn to verify that the information Officer Dunn had provided regarding the December 27,

1998 incident was correct. Officer Dunn confirmed the accuracy of the information he had provided to Mr. Williams.

On September 15, 2000, Brad Lewis filed a complaint in the Circuit Court for Davidson County seeking damages for libel.[5] He named as defendants NewsChannel 5, its parent corporation, Deborah F. Turner, the general manager of NewsChannel 5, and Messrs. Cutler and Williams.[6] On January 10, 2002, Brad Lewis filed an amended complaint adding a false light invasion of privacy claim to his defamation claim. On May 14, 2002, the NewsChannel 5 defendants filed a motion for summary judgment asserting that Brad Lewis would be unable to prove that the statements about him in the August 9, 2000 story were false or that they had acted with actual malice in the preparation and broadcast of the August 9, 2000 story. In a supplemental memorandum filed on November 24, 2004, they also claimed that they were shielded from liability by the fair report privilege.

The Department's Office of Professional Accountability completed its internal investigation in September 2002. The investigators interviewed Officer Dunn, four other police officers, and another person who had been detained along with Brad Lewis on December 27, 1998. They also reviewed the recordings of the radio dispatches and telephone conversations between Major Dollarhide and the dispatcher. All the witnesses supported Officer Dunn's account of the incident, and one officer stated specifically that he had seen the sawed-off shotgun, a bag containing money, and what appeared to be gambling

---

5. Major Dollarhide filed his own libel action in the Circuit Court for Davidson County on June 21, 2001. The trial court consolidated these cases for the purpose of discovery.

6. Because Major Dollarhide and Brad Lewis asserted the same claims against all the defendants, the defendants, unless referred to by name, will be referred to collectively as "the NewsChannel 5 defendants."

paraphernalia in Brad Lewis's pickup truck. Based on this information, the report concluded:

> Based on the serious nature of the allegations regarding Major Dollarhide's conduct in the arrest of Mr. Brad Lewis, Major Dollarhide was placed on administrative leave and ordered to surrender his police credentials and departmentally issued weapon on or about August 8, 2000. He remained on administrative leave status from August 9, 2000 until August 22, 2000. On August 25, 2000, Major Dollarhide took sick leave and remained in that status until December 18, 2000. He was carried as excused from December 18 through December 31, 2000. Effective January 1, 2001, Major Dollarhide retired from the Police Department.
>
> During this investigation, the Federal Bureau of Investigation conducted a parallel criminal investigation. Sometime during 2002, the investigation was reportedly closed and to date no criminal charges have been lodged. However, due to the criminal investigation, Major Dollarhide was not interviewed regarding his conduct on December 27, 1998.
>
> The evidence and witness statements generally corroborated Officer Dunn's account of the events of December 27, 1998. It is therefore likely that disciplinary charges would have been recommended, if Major Dollarhide had continued employment with the Metropolitan Nashville Police Department. Since Major Dollarhide resigned prior to the completion of the investigation in this matter, this investigation is closed and the file will be maintained as a **Matter of Record.**[7]

In December 2003, the Office of Professional Accountability issued an even more detailed report regarding the December 27, 1998 incident. This report was in response to Brad Lewis's complaint that Officer Dunn had been untruthful in a deposition he had given on June 25, 2001. Specifically, Brad Lewis accused Officer Dunn of falsely accusing him of possessing an illegal firearm, gambling paraphernalia, and a large amount of cash when he was detained at the roadblock. After reviewing the statements and depositions of six police officers, the tape recordings of the radio traffic and telephone calls, and other evidence, the Office of Professional Accountability concluded that Brad Lewis's allegation that Officer Dunn had been untruthful could not be conclusively established.

By the time the trial court conducted the hearing on the motion for summary judgment on December 16, 2004, the parties had deposed thirty-six witnesses and had submitted numerous depositions and affidavits regarding the NewsChannel 5 defendants' motion for summary judgment. On January 10, 2005, the trial court filed a detailed and well-researched memorandum and order granting the summary judgment.[8] Based on Major Dollarhide's concession that he was a public official, the trial court concluded that the evidence demonstrated, as a matter of law, that Major Dollarhide would not be able to prove that the NewsChannel 5 defendants acted recklessly in the investigation and broadcast of the August 9, 2000 story and, therefore, that his claims would fail because he would be unable to prove that the defendants acted with actual malice.

---

7. Emphasis in the original.

8. *Lewis v. NewsChannel 5 Network L.P.,* Nos. 00C–2704, 01C–1873, 2005 WL 3237681 (Davidson Cir. Jan. 10, 2005).

The trial court then turned its attention to Brad Lewis's claims. After noting that "the case law in this area is somewhat cloudy and that the decision on this issue is a close one," the court determined that Brad Lewis was not a public figure "because he did not voluntarily involve himself in this incident and was certainly unknown to the public prior to this incident." However, the trial court determined that Brad Lewis could not prevail on his libel claim because "[n]o reasonable juror could find negligence given the investigation undertaken by the reporter and the action taken by the Police Department, all of which occurred *prior* to the story being reported." The court also concluded that the fair report privilege shielded the News-Channel 5 defendants from liability for defamation stemming from the August 9, 2000 broadcast.

Finally, the trial court determined, as a matter of law, that Brad Lewis and Major Dollarhide would be unable to substantiate their false light invasion of privacy claims against the NewsChannel 5 defendants. The court held that actual malice standard applied to both claims. The court reasoned that even though Brad Lewis was a private person, Major Dollarhide's intervention on his behalf and the subsequent action by the Chief of Police made the incident a matter of public concern. Accordingly, the trial court determined that Major Dollarhide and Brad Lewis "cannot carry their burden of showing that the defendants acted with actual malice." Brad Lewis has appealed.[9]

## II.

### THE STANDARD OF REVIEW

The standards for reviewing summary judgments on appeal are well settled.

Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe,* 952 S.W.2d 408, 410 (Tenn.1997); *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn. 1993); *Pendleton v. Mills,* 73 S.W.3d 115, 121 (Tenn.Ct.App.2001). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted when the undisputed facts, as well as the inferences reasonably drawn from the undisputed facts, support only one conclusion-that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 620 (Tenn.2002); *Webber v. State Farm Mut. Auto. Ins. Co.,* 49 S.W.3d 265, 269 (Tenn.2001); *Clifford v. Crye–Leike Commercial, Inc.,* 213 S.W.3d 849, 852 (Tenn.Ct.App.2006).

The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn.2002); *Shadrick v. Coker,* 963 S.W.2d 726, 731 (Tenn.1998). When the moving party is the defendant, it is entitled to a judgment as a matter of law only when it affirmatively negates an essential element of the non-moving party's claim or establishes an affirmative defense that conclusively defeats the non-moving party's claim. *Byrd v. Hall,* 847 S.W.2d at 215 n. 5; *Cherry v. Williams,* 36 S.W.3d 78, 82–83 (Tenn.Ct.App.2000).

Summary judgments enjoy no presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn.2003); *Scott v. Ash-*

---

9. Major Dollarhide elected not to appeal from the dismissal of his claims against the News-

Channel 5 defendants.

*land Healthcare Ctr., Inc.,* 49 S.W.3d 281, 285 (Tenn.2001). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49, 50–51 (Tenn.1997). We must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Godfrey v. Ruiz,* 90 S.W.3d at 695; *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001).

■ Summary judgments are particularly well-suited for false light and libel claims because the determination concerning whether the plaintiff is a public figure is a question of law, *see Ferguson v. Union City Daily Messenger, Inc.,* 845 S.W.2d 162, 166 (Tenn.1992); *McDowell v. Moore,* 863 S.W.2d 418, 420 (Tenn.Ct.App.1992), as is the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice. *Flatt v. Tenn. Secondary Schs. Athletic Ass'n,* No. M2001–01817–COA–R3–CV, 2003 WL 61251, at *3 (Tenn.Ct.App. Jan.9, 2003) (No Tenn. R.App. P. 11 application filed); *Tomlinson v. Kelley,* 969 S.W.2d 402, 405 (Tenn.Ct.App.1997) *Trigg v. Lakeway Publishers, Inc.,* 720 S.W.2d 69, 74 (Tenn.Ct. App.1986). The "determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).[10]

■ Accordingly, where the actual malice standard applies, the "burden is upon plaintiff to show with 'convincing clarity' the facts which make up the 'actual malice.'" *Trigg v. Lakeway Publishers, Inc.,* 720 S.W.2d at 75.[11] Thus, "a public figure cannot resist a ... motion for summary judgment under Tenn. R. Civ. P. 56 by arguing that there is an issue for the jury as to malice unless he makes some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred." *Trigg v. Lakeway Publishers, Inc.,* 720 S.W.2d at 74. When reviewing a grant of summary judgment to a defendant in such a case, we must "determine, not whether there is material evidence in the record supporting [the plaintiff], but whether or not the record discloses clear and convincing evidence upon which a trier of fact could find actual malice." *Piper v. Mize,* No. M2002–00626–COA–R3–CV, 2003 WL 21338696, at *7 (Tenn.Ct.App. June 10, 2003) (No Tenn. R.App. P. 11 application filed).

---

**10.** "[W]here the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2514.

**11.** *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255–56, 106 S.Ct. at 2514 ("[W]here the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."); *Stewart v. Peterson,* Knox Law No. 1184, 1988 WL 130313, at *5 (Tenn.Ct.App. Dec.7, 1988) (No Tenn. R.App. P. 11 application filed); *Kirk v. Houston's Restaurant, Inc.,* Shelby Law No. 13, 1988 WL 53336, at *5 (Tenn.Ct.App. May 26, 1988) (No Tenn. R.App. P. 11 application filed) (A "plaintiff must show, by clear and convincing evidence, that there is a genuine issue of whether actual malice existed when the statement was published.").

## III.

### THE APPLICABILITY OF THE FAIR REPORT PRIVILEGE

■ Brad Lewis argues that the trial court erred by determining the fair report privilege applied to the portion of the August 9, 2000 broadcast describing the contents of his pickup truck when he was detained on December 27, 1998. The NewsChannel 5 defendants respond that the fair report privilege applies because the August 9, 2000 broadcast was a fair and accurate account of the official disciplinary action that the Chief of Police took against Major Dollarhide. The trial court reasoned that the "privilege normally protects the news media when it publishes reports of arrests by the police and accurately recounts police officers statements concerning arrests of suspects or arrested individuals." We have concluded that the trial court erred by holding that statements in the August 9, 2000 broadcast regarding the details of Brad Lewis's detention on December 27, 1998 were protected by the fair report privilege.

### A.

The Tennessee Supreme Court recognized the fair report privilege in 1871. *Saunders v. Baxter,* 53 Tenn. (6 Heisk.) 369, 381 (1871) ("[A] *bona fide* report of the proceedings in a court of justice, in the absence of express malice, is not libel, though the publication may be injurious to the character of an individual"). Over thirty years later, the court pointed out that the foundation of the privilege was the importance attached to keeping the public informed of the proceedings in court, *American Publ'g Co. v. Gamble,* 115 Tenn. 663, 678, 90 S.W. 1005, 1008 (1906), and of the contents of papers filed in court, *Langford v. Vanderbilt Univ.,* 199 Tenn. 389, 399, 287 S.W.2d 32, 37 (1956). Thus, the fair report privilege has traditionally protected "newspapers which make reports of judicial proceedings to the public, in order that members of the public may be apprised of what takes place in the proceedings without having been present." *Smith v. Reed,* 944 S.W.2d 623, 625 (Tenn.Ct.App. 1996).

■ Unlike the absolute privileges attached to statements made during judicial or legislative proceedings, the fair report privilege is a qualified privilege rather than an absolute one. *Langford v. Vanderbilt Univ.,* 44 Tenn.App. 694, 706, 318 S.W.2d 568, 574 (1958). In order for the privilege to apply, the report must be "a fair and accurate summation of the proceeding," and must display balance and neutrality. *Smith v. Reed,* 944 S.W.2d at 625. The report need not be a verbatim, technically accurate account in every detail, as long as it conveys a correct and just impression of what took place. *American Publ'g Co. v. Gamble,* 115 Tenn. at 677, 90 S.W. at 1008; *Smith v. Reed,* 944 S.W.2d at 625; *Langford v. Vanderbilt Univ.,* 44 Tenn.App. at 707, 318 S.W.2d at 574–75. However, even a report of a judicial proceeding will not be shielded by the privilege if it contains any false statement of fact regarding what occurred during the proceeding, any garbled or one-sided account of the proceeding, or any defamatory observations or comments. *Saunders v. Baxter,* 53 Tenn. at 383; *Black v. Nashville Banner Publ'g Co.,* 24 Tenn.App. 137, 145, 141 S.W.2d 908, 913 (1939).

Since 1871, the application of the fair report privilege has expanded beyond reports of judicial proceedings and the contents of papers filed in court to reports of other official governmental actions. The courts have applied the privilege to reports of public meetings of local government

bodies,[12] reports regarding the contents of arrest warrants,[13] and even to reports regarding the contents of search warrants.[14] Accordingly, Tennessee's version of the fair report privilege in its current form closely, though not exactly, mirrors the scope of the privilege found in the Restatement (Second) of Torts § 611, at 297 (1977) ("The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.").

 Despite the expansion of the privilege's application, the fair report privilege does not extend so far as to provide protection from liability for fair and accurate reports of statements made by any governmental employee in any circumstance. It remains limited to circumstances involving public proceedings or official actions of government that have been made public. The purpose of the privilege is to serve the public's interest in being informed of official actions or proceedings that are themselves public. Restatement (Second) of Torts § 611 cmt. a, at 297; David A. Elder, *Defamation: A Lawyer's Guide* § 3:12, at 3-38-3-39, 3-42 (2003) ("*Defamation: A Lawyer's Guide* ").[15] It accomplishes this purpose by allowing the media and others to be the eyes and ears of the members of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 115, at 836 (5th ed.1984).[16] The privilege enables persons reporting on official actions or proceedings to broadcast, print, post, or now blog about official actions or proceedings without the fear of being subjected to a tort action for fair and accurate reports, even if these reports contain defamatory or embarrassing statements by governmental employees.

## B.

In light of the current scope of Tennessee's fair report privilege, the pivotal ques-

**12.** *Evans v. Nashville Banner Publ'g. Co.*, No. 87-164-II, 1988 WL 105718, at *5 (Tenn.Ct. App. Oct.12, 1988) (No Tenn. R.App. P. 11 application filed) (noting that the "public's interest in having the business of a local zoning board made known is no less than its interest in being informed of judicial proceedings.").

**13.** *Duncan v. Knoxville Journal Corp.*, No. 03A01-9202-CV-00059, 1992 WL 136172, at *1 (Tenn.Ct.App. June 19, 1992) (No Tenn. R.App. P. 11 application filed).

**14.** *Stem v. Gannett Satellite Info. Network, Inc.*, 866 F.Supp. 355, 359 (W.D.Tenn.1994).

**15.** *See also Pearce v. Courier-Journal*, 683 S.W.2d 633, 636 (Ky.Ct.App.1985) ("The policy consideration giving rise to the rule is that the public should be informed of public proceedings."); *Wynn v. Smith*, 117 Nev. 6, 16 P.3d 424, 429 (Nev.2001) ("The fair report privilege is premised on the theory that members of the public have a manifest interest in observing and being made aware of public proceedings and actions. Access to information concerning the conduct of public representatives is critical to the citizenry's supervision and evaluation of actions taken on its behalf."); *Costello v. Ocean County Observer*, 136 N.J. 594, 643 A.2d 1012, 1018 (1994); *Fortenbaugh v. New Jersey Press, Inc.*, 317 N.J.Super. 439, 722 A.2d 568, 573 (1999) ("Its purpose is to assure the public interest in knowing what takes place in official proceedings.").

**16.** *See also Wynn v. Smith*, 16 P.3d at 429 ("Obviously unable to monitor all official acts in person, citizens rely on third party accounts of such actions."); *Fortenbaugh v. New Jersey Press, Inc.*, 722 A.2d at 573 ("The underlying rationale is that members of the public, had they been present, would have seen and heard the same statements which were reported; the publisher is merely an interlocutor to the public at large.").

tion in this case is whether all or any portion of the August 9, 2000 broadcast dealt with an official action or proceeding.[17] The NewsChannel 5 defendants insist that the privilege applies to Mr. Williams's entire story because the story was a report about the Chief of Police's official action disempowering Major Dollarhide and about the allegations that police officers had made about Major Dollarhide's intervention on behalf of Brad Lewis that were being investigated by the Office of Professional Accountability. Essentially, the NewsChannel 5 defendants insist that the entire story is privileged not only because of its content but also because of the sources for the information used in the report. The NewsChannel 5 defendants are asking this court to expand the scope of the fair report privilege's protections too far.

The only official action or proceeding involving Major Dollarhide that occurred on August 9, 2000 was the issuance of the Chief of Police's press release announcing that he had disempowered Major Dollarhide. This press release did not mention any of the details surrounding the December 27, 1998 incident involving Brad Lewis. It did not even mention Brad Lewis by name. Similarly, while the press release alluded to an investigation by the Office of Professional Accountability and conversations with the District Attorney General, it provided no specifics regarding the substance or status of the investigation or the nature or content of the conversations with the District Attorney General.

There is little question that the August 9, 2000 story would have been protected by the fair report privilege had it been limited to the contents of the Chief of Police's press release. However, the story contained other information regarding the details of the December 27, 1998 incident and the nature and status of the Office of Professional Accountability's internal investigation that did not come from the press release. Mr. Williams obtained these details from anonymous informants, a private conversation with Officer Dunn, and recordings of official radio transmissions and telephone calls that had not been released to the public. Thus, it remains for us to determine whether the information Mr. Williams received on his telephone hotline, from his private interview with Officer Dunn, and from his anonymous sources can be considered information obtained as a result of an official action or proceeding.

The prevailing view is that the fair report privilege should not be extended to apply to the "myriad types of informal reports and official and unofficial investigations, contacts, and communications of law enforcement personnel at all levels of the state and federal bureaucracy with local, regional, and national media." *Defamation: A Lawyer's Guide* § 3:10, at 3–30–3:31; *see also Wiemer v. Rankin*, 117 Idaho 566, 790 P.2d 347, 354 (1990); *Kelley v. Hearst Corp.*, 2 A.D.2d 480, 157 N.Y.S.2d 498, 502 (1956). It should be applied only to reports of official actions or proceedings involving responsible, authoritative decision-makers who assume legal and political responsibility for their actions. *Defamation: A Lawyer's Guide* § 3:12, at 3–42. Unofficial, off-the-record statements, especially when the source remains confidential, lack the dignity and authoritative weight of official actions and proceedings and, therefore, reports of

---

17. The broadcast was not a report of a meeting on a matter of public concern that was open to the public. Therefore, it is unnecessary to consider in the present case whether Tennessee law should include such meetings within the protection afforded by the fair report privilege.

these statements should not be protected by the fair report privilege. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C.1980); Jonathan Donnellan & Justin Peacock, *Truth and Consequences: First Amendment Protection for Accurate Reporting on Government Investigations*, 50 N.Y.L. Sch. L.Rev. 237, 241 (2005–2006).

The American Law Institute has addressed how far the scope of "official action" extends into the domain of arrests and the underlying facts associated with the arrests by differentiating between reports of an arrest and statements regarding the underlying facts that precipitated the arrest. The Restatement (Second) of Torts states that "[a]n arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest" is within the fair report privilege; however, "statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself" are not. Restatement (Second) of Torts § 611 cmt. h, at 301.

The NewsChannel 5 defendants do not directly contest the prevailing view, but rather insist that *Yohe v. Nugent*, 321 F.3d 35 (1st Cir.2003) supports their assertion that the entire August 9, 2000 story is protected by the fair report privilege. This argument misapprehends the significant and controlling factual differences between the facts of *Yohe v. Nugent* and the facts of this case. The report at issue in *Yohe v. Nugent* involved statements by the chief of police during an official interview that was conducted on the record. In contrast, the details of the December 27, 1998 incident that were reported by Mr. Williams during the August 9, 2000 broad-

cast came from anonymous sources who declined to speak on the record and from low ranking police officers. These statements do not reflect official agency action, *Bufalino v. Associated Press*, 692 F.2d 266, 272 (2d Cir.1982), and do not have sufficient "authoritative weight" to be considered an official public proceeding. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d at 89.

The rub in this case, at least with regard to the fair report privilege, is that prior to Mr. Williams's August 9, 2000 story, there had been no official action, report, or proceeding in which the information claimed to be defamatory by Brad Lewis had been released. To the contrary, the details regarding the December 27, 1998 incident or the existence or status of internal investigations were not generally known. The August 9, 2000 story did more than broadcast to the members of the public what they would have read or heard had they been provided with a copy of the Chief of Police's press release. Instead, it reported the details of a story about a high ranking police official preventing the arrest of his brother-in-law after his brother-in-law had been caught possessing weapons, gambling paraphernalia, and a large amount of cash. Official actions and proceedings are the core of the fair report privilege. They are not present in this case, and therefore neither is the privilege. Thus, it is incumbent upon this court to address directly Brad Lewis's libel and false light invasion of privacy claims.

## IV.

### BRAD LEWIS'S LIBEL CLAIM

Both parties take issue with the trial court's disposition of Brad Lewis's libel claim. The NewsChannel 5 defendants assert that the trial court erred by classifying Brad Lewis as a private person and by not measuring his case against the height-

ened "actual malice" standard applicable to libel claims brought by public figures. For his part, Brad Lewis asserts that the trial court correctly characterized him as a private person but that the trial court erred by determining that he would be unable to prove that the NewsChannel 5 defendants negligently prepared and aired the August 9, 2000 story. In fact, Brad Lewis contends that the record reflects his ability to prove not only a negligence claim but also an actual malice claim. We have determined Brad Lewis is an involuntary public figure for the purpose of the reports regarding Major Dollarhide's disempowerment and, therefore, that the trial court erred by not measuring his claim against the actual malice standard. We have also determined, based on the undisputed evidence, that Brad Lewis will be unable to prove that the NewsChannel 5 defendants acted with actual malice in the investigation or airing of the August 9, 2000 story.

### A.

Both the Constitution of the United States and the Constitution of Tennessee reflect this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721 (1964); *see also Press, Inc. v. Verran,* 569 S.W.2d 435, 442 (Tenn.1978). The First Amendment succinctly proscribes laws "abridging the freedom of speech, or of the press." Article I, Section 19 of the Constitution of Tennessee, drafted more than five years later and patterned after the Constitution of Pennsylvania, states in part:

> [t]hat the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication

of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for abuse of that liberty.

■ Article I, Section 19 of the Tennessee Constitution provides at least as much protection of the freedoms of speech and press as the First Amendment. *Doe v. Doe,* 127 S.W.3d 728, 732 (Tenn.2004); *City of Cleveland v. Wade,* 206 S.W.3d 51, 56 n. 6 (Tenn.Ct.App.2006). It could provide more. *Leech v. Am. Booksellers Ass'n, Inc.,* 582 S.W.2d 738, 745 (Tenn. 1979). In fact, the Tennessee Supreme Court has held that its protections of the freedoms of speech and press are "substantially stronger" than the First Amendment because "it is clear and certain, leaving nothing to conjecture and requiring no interpretation, construction, or clarification." *Press, Inc. v. Verran,* 569 S.W.2d at 442.

■ An essential part of the constitutionally protected freedoms of speech and press is the right to debate public issues and to examine and criticize the conduct of governmental officials. In fact, this right had been characterized as a "political duty" that "should be a fundamental principle of the American government." *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). The Tennessee Supreme Court has likewise observed that "the news media have not only a right but a duty to make searching inquiry into all phases of official conduct and to realistically evaluate and assess the performance of duty by public officers." *Press, Inc. v. Verran,* 569 S.W.2d at 442.

### B.

Discussion and debate regarding the actions of public officials and other matters

of public interest is not always decorous. It often includes "vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 721. It may likewise "disturb our tranquility," "vex our peace of mind," "outrage our sensibilities," or "shock our conscience." *Press, Inc. v. Verran,* 569 S.W.2d at 442. Nonetheless, both the United States Supreme Court and the Tennessee Supreme Court have held that the discussion and debate regarding the conduct of public officials and other subjects of public importance are so indispensable to our free society that they deserve constitutional protection, even when they contain factual mistakes or defamatory statements, *New York Times Co. v. Sullivan,* 376 U.S. at 273, 84 S.Ct. at 722, or even if they may be "distasteful, despicable, and shorn of all sense of fairness." *Press, Inc. v. Verran,* 569 S.W.2d at 442.

The contours of the constitutional protection of public discussion and debate regarding the conduct of public officials and other matters of public interest began to be defined when the United States Supreme Court decided *New York Times Co. v. Sullivan* in 1964. The case involved a libel action brought in state court by L.B. Sullivan, the elected Commissioner of Public Affairs of Montgomery, Alabama, against *The New York Times* and four clergymen. Part of Mr. Sullivan's duties included supervising the Montgomery Police Department. The four clergymen had placed an advertisement in *The New York Times* critical of the conduct of law enforcement officials. The United States Supreme Court overturned a $500,000 verdict for Mr. Sullivan after determining that Alabama's common-law principles applicable to civil libel actions did not provide

constitutionally sufficient safeguards for the freedom of speech and the freedom of the press. Accordingly, the Court determined that the First Amendment prohibits a public official from recovering damages for a defamatory falsehood relating to his or her official conduct without proof that the statement was made with "actual malice." [18] *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 726.

In reaching its conclusion, the Court noted that public discussion of the acts of public officials often contain errors of fact. *New York Times Co. v. Sullivan,* 376 U.S. at 271–72, 84 S.Ct. at 721–22. However, the Court also observed that requiring the critics of public officials to guarantee the truth of all their statements on pain of a libel judgment would deter them from voicing their criticism and would thus dampen the vigor and limit the variety of the public debate. *New York Times Co. v. Sullivan,* 376 U.S. at 279, 84 S.Ct. at 725. Thus, to protect the public discourse about government and the official conduct of public officials, the Court determined that an error, even one resulting from negligence, should not be sufficient to recover tort damages. The Court reached this conclusion, in part, because "erroneous statement[s] . . . must be protected if the freedoms of expression are to have the 'breathing space' they need to survive." *New York Times Co. v. Sullivan,* 376 U.S. at 271–72, 84 S.Ct. at 721 (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338 (1963)).

Even though *New York Times Co. v. Sullivan* involved defamation claims brought by a "public official," the Court did not provide specific guidance for determining whether a particular person is a

---

**18.** The Court held that a statement is made with "actual malice" when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 726.

public official or not.[19] Two years later, the Court provided further guidance regarding who could be considered a public official when it held that "[t]he 'public official' designation applies at the very least to those among the hierarchy of governmental employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966).

The "actual malice" standard of *New York Times Co. v. Sullivan* applied only to libel actions brought by public officials. In 1967, the United States Supreme Court extended the standard to apply to "public figures" in *Curtis Publ'g Co. v. Butts,* 388 U.S. at 148, 87 S.Ct. 1975 (1967). The decision actually involved two cases, one arising from the federal courts and the other from state courts, and the facts of each case shed light on the Court's understanding of who public figures are.

The first case involved an article published in the *Saturday Evening Post* accusing Wallace Butts, the University of Georgia's athletic director, of conspiring to rig the 1962 football game between the University of Georgia and the University of Alabama. At that time, the University of Georgia's athletic director was not a state employee but rather was employed by a private corporation. Mr. Butts resigned following the publication of the article and filed a libel action in the United States District Court against the *Saturday Evening Post* seeking $10,000,000 in actual

and punitive damages. The publisher's principle defense was that the article was true. It did not assert a constitutional defense based on the First Amendment because Mr. Butts was not a public official and because the case was tried before the Court had handed down its *New York Times Co. v. Sullivan* decision.[20]

The evidence at trial cast serious doubt on the adequacy of the investigation underlying the article. The jury awarded Mr. Butts $60,000 in compensatory damages and $3,000,000 in punitive damages, but the district court remitted the total judgment to $460,000. Soon thereafter, the United States Supreme Court handed down its *New York Times Co. v. Sullivan* decision, and the publisher filed a motion for new trial to bring the decision to the district court's attention. The district court denied the publisher's motion because Mr. Butts was not a public official and because the jury could have concluded that the publisher had acted with reckless disregard as to whether the article was false or not. The United States Court of Appeals for the Fifth Circuit affirmed the judgment in a divided vote.

The second case involved an Associated Press wire story about former General Edwin A. Walker's involvement in the September 30, 1962 riot on the campus of the University of Mississippi resulting from the federal efforts to enroll James Meredith at the university. General Walker had commanded the federal troops during the 1957 school desegregation confrontation in Little Rock, Arkansas and had later

---

**19.** Because Mr. Sullivan was the elected city commissioner in charge of the police department, the Court determined that he was clearly a public official and, therefore, that the case did not provide an "occasion ... to determine how far down into the lower ranks of government employees the 'public official' designation would extend." *New York Times*

*Co. v. Sullivan,* 376 U.S. at 283 & n. 23, 84 S.Ct. at 727 & n. 23.

**20.** The publisher had asserted general constitutional defenses in the separate libel action brought by the University of Alabama's football coach who was a state employee. *Curtis Publ'g Co. v. Butts,* 388 U.S. at 137, 87 S.Ct. at 1982.

resigned from the United States Army to engage in political activity. He had received broad publicity regarding his opposition to the intervention of federal troops in local desegregation matters and had achieved national political prominence.

The Associated Press story stated that General Walker had taken command of a violent crowd of protestors and had personally led a charge against the federal marshals. General Walker filed a $2,000,000 libel action against the Associated Press in state court in Texas. He insisted that he had actually tried to dissuade the crowd from violence. The evidence at trial revealed a minor discrepancy between the Associated Press's reporter's eyewitness account of the event to the news bureau and the wire story itself. However, there was no other evidence of improper preparation of the story or of personal prejudice or incompetency on the part of the Associated Press or its reporter. A jury awarded General Walker $500,000 in compensatory damages and $300,000 in punitive damages, but the trial court declined to approve the punitive damage award because of inadequate evidence of malice. While the trial court explicitly declined to apply the *New York Times Co. v. Sullivan* standard, it noted that the standard, had it been applicable, would have required a verdict for the Associated Press. The Texas Court of Appeals affirmed, and the Texas Supreme Court declined to review the decision.

The Court's decision in these cases extended the constitutionally mandated "actual malice" principles to persons who are deemed to be "public figures." *Curtis Publ'g Co. v. Butts*, 388 U.S. at 155, 87 S.Ct. at 1991.[21] None of the justices provided bright line rules for determining whether or not a particular person is a public figure. The plurality suggested that a person could be classified as a public figure by "attain[ing] that status by position alone" or by "purposeful activity amounting to a thrusting of his [or her] personality into the 'vortex' of an important public controversy." *Curtis Publ'g Co. v. Butts*, 388 U.S. at 155, 87 S.Ct. at 1991.

The Court concluded that Mr. Butts and General Walker were public figures—Mr. Butts by virtue of his position and General Walker by virtue of "his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy." *Curtis Publ'g v. Butts*, 388 U.S. at 155, 87 S.Ct. at 1991. The Court affirmed the judgment for Mr. Butts but reversed the judgment for General Walker.

In 1971, the United States Supreme Court was presented with another occasion to further expand the First Amendment's protection of the freedoms of speech and the press. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). This case involved a libel action filed by George A. Rosenbloom against a radio station for running a series

21. Justice Harlan's four-justice plurality opinion did not employ the "actual malice" standard but rather a less demanding "gross negligence" standard. Edward T. Fenno, *Public Figure Libel: The Premium on Ignorance and the Race to the Bottom*, 4 S. Cal. Interdisc. L.J. 253, 279 (1995); Frederick Schauer, *Public Figures*, 25 Wm. & Mary L.Rev. 905, 932 (1983–84). However, the views of the other five justices contained in the concurring and two dissenting opinions support the "actual malice" standard, although Justices Black and Douglas would have preferred absolute protection of the press from defamation suits. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 336 n. 7, 94 S.Ct. 2997, 3007 n. 7, 41 L.Ed.2d 789 (1974); *see also* Catherine Hancock, *Origins of the Public Figure Doctrine in First Amendment Defamation Law*, 50 N.Y.L. Sch. L.Rev. 81, 83 & n. 11 (2005–2006).

of stories about Philadelphia's crackdown on "smut merchants." Mr. Rosenbloom was allegedly a distributor of obscene material, but he was not a "public figure" as the Court had used the term in *Curtis Publishing Co. v. Butts.* Accordingly, the Court characterized the issue as whether the *New York Times Co. v. Sullivan* standard "applies in a state civil libel action brought not by a 'public official' or a 'public figure' but by a private individual for a defamatory falsehood uttered in a news broadcast ... about the individual's involvement in an event of public or general interest." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 31–32, 91 S.Ct. at 1814.

A majority of the justices could not agree on the proper approach for determining whether the "actual malice" standard should apply in the circumstances involved in the case. A three-justice plurality reasoned that "[i]f a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 43, 91 S.Ct. at 1819. Thus, the plurality placed the event, not the person, at the center of its analysis. The plurality explained that "[t]he public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 43, 91 S.Ct. at 1819. Thus, the plurality viewed its standard as honoring "the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern without regard to whether the persons involved are famous or anonymous." *Rosenbloom v. Metrome-*

*dia, Inc.,* 403 U.S. at 43–44, 91 S.Ct. at 1819–20.

The *Rosenbloom* plurality did not ignore the arguments in favor of retaining the distinction between public figures and private persons. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 45–47, 91 S.Ct. at 1820–21. However, it noted that strong First Amendment concerns exist with regard to "dampening discussion of issues of public or general concern because they involve private citizens." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 48, 91 S.Ct. at 1822. In the plurality's view, "[v]oluntarily or not, we are all 'public' men [or women] to some degree.'" *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 48, 91 S.Ct. at 1822. Thus, the controlling question, at least insofar as the plurality was concerned, is whether the defamatory statement relates to a matter of public concern.

Three years later, in 1974, the United States Supreme Court retreated somewhat from the plurality opinion in *Rosenbloom v. Metromedia, Inc.* The case involved a libel action against a magazine filed by Elmer Gertz, a Chicago lawyer who had been retained by the family of a young man who had been shot by a police officer. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The magazine had published an article stating that the police officer's murder trial, in which Mr. Gertz had not played a role, was part of a Communist conspiracy to discredit local police and that Mr. Gertz was a Communist who had masterminded the frame up. The United States District Court granted the publisher of the magazine a judgment notwithstanding the verdict after concluding that the *New York Times Co. v. Sullivan* standard protected the discussion of any public issue without regard to the status of the person defamed

therein.[22] The United States Court of Appeals for the Seventh Circuit affirmed, citing *Rosenbloom v. Metromedia, Inc.* The circuit court construed *Rosenbloom* to require the application of the *New York Times Co. v. Sullivan* standard to any publication or broadcast about an issue of public interest, without regard to the position, fame, or anonymity of the person defamed.[23]

The United States Supreme Court concluded that the *Rosenbloom* plurality had gone a step too far and had not properly balanced the reputation interests of private persons with the free speech and free press concerns implicated in defamation actions. The Court noted the tension between the competing interests in compensating individuals for defamatory falsehoods and in maintaining the "breathing space" essential to the fruitful exercise of the freedom of speech and the freedom of the press. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 341–42, 94 S.Ct. at 3008 (quoting *NAACP v. Button*, 371 U.S. at 433, 83 S.Ct. at 338). While the Court concluded that the actual malice standard struck an appropriate balance for public officials and public figures,[24] it found that private persons are more vulnerable to injury and, therefore, more deserving of recovery. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 344–45, 94 S.Ct. at 3009–10. Therefore, the Court concluded that the states should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private person. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345–46, 94 S.Ct. at 3010.

Because of its renewed focus on the status of the defamed person, the Court provided a more detailed description of persons who could be characterized as public figures. The Court identified three categories of public figures. The most common category, referred to as voluntary limited purpose public figures, includes persons who have voluntarily thrust themselves to the forefront of a particular public controversy in order to influence the resolution of the issues involved. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 351, 94 S.Ct. at 3009, 3013. The second category, referred to as all-purpose public figures, includes persons who achieve such pervasive fame or notoriety that they become public figures for all purposes. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 351, 94 S.Ct. at 3009, 3013.[25] The third, and least common, category is referred to as involuntary public figures. This category includes persons who become public figures through no purposeful action of their own, *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009, but who have been drawn into a particular public controversy. *Gertz. v. Robert Welch, Inc.*, 418 U.S. at 351, 94 S.Ct. at 3013.

The focus of the plurality in *Rosenbloom v. Metromedia, Inc.* had been on whether the allegedly defamatory speech involved a matter of public concern. In *Gertz v. Robert Welch, Inc.*, the Court de-emphasized the importance of the nature of the issue

**22.** *Gertz v. Robert Welch, Inc.*, 322 F.Supp. 997, 999–1000 (D.Ill.1970).

**23.** *Gertz v. Robert Welch, Inc.*, 471 F.2d 801, 805–06 (7th Cir.1972).

**24.** *Gertz v. Robert Welch, Inc.*, 418 U.S. at 336, 94 S.Ct. at 3005; *see also Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989) (noting that by the time *Gertz v. Robert Welch, Inc.* was decided, the Court unanimously agreed that the actual malice standard applied to public figures).

**25.** Some constitutional scholars have classified both Mr. Butts and General Walker as all-purpose public figures. 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 20.35(a), at 483 (1999).

or event being discussed and focused instead on the status of the defamed person. Accordingly, the pivotal dispute in many subsequent defamation cases has involved whether the defamed person is a public figure.

The United States Supreme Court's more detailed discussion of "public figure" in *Gertz v. Robert Welch, Inc.* still required the existence of a "particular public controversy." The Court focused on this requirement in 1976 in a case involving a defamatory article in *Time* magazine involving the divorce of a socially prominent Palm Beach couple. *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The magazine insisted that the Mary Alice Firestone's libel claim should be measured against the *New York Times Co. v. Sullivan* actual malice standard because the Firestones' divorce was a "cause célèbre" in Palm Beach society.[26] The Court rejected this argument. It stated that equating "public controversy" with all controversies of interest to the public could reinstate the plurality opinion in *Rosenbloom v. Metromedia, Inc.* that had been rejected in *Gertz v. Robert Welch, Inc. Time, Inc. v. Firestone*, 424 U.S. at 454, 96 S.Ct. at 965.

The Court determined that Ms. Firestone was not a public figure and, therefore, that her libel claim against the magazine was not subject to the *New York Times Co. v. Sullivan* actual malice standard. The Court first noted that the Ms. Firestone had not voluntarily publicized the details of her married life but rather had been compelled to reveal this information in the context of the divorce proceedings instituted by her husband.[27] The

Court also noted that the judicial dissolution of a marriage, even one that "may be of interest to some portion of the reading [or viewing] public" was not the sort of "public controversy" referred to in *Gertz v. Robert Welch, Inc. Time, Inc. v. Firestone*, 424 U.S. at 454, 96 S.Ct. at 965.

The Court again turned its attention to limited purpose public figures in two opinions handed down in 1979. The first case involved a behavioral scientist who had obtained grants from two federal agencies to study objective measures of aggression in certain animals. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Robert T. Hutchinson had not sought to publicize his research beyond a limited number of other professionals in the field and had not thrust himself or his research into a public controversy. Rather, his research became a public issue after Senator William Proxmire singled him out for ridicule by giving him the "Golden Fleece of the Month Award." *Hutchinson v. Proxmire*, 443 U.S. at 114–17, 99 S.Ct. at 2677–79.

The Court declined to find that Mr. Hutchinson was a limited purpose public figure for three reasons. First, the Court, noting that Mr. Hutchinson was not a public figure before Senator Proxmire gave him the Golden Fleece Award, held that defendants in civil libel actions cannot create their own defense by making the plaintiff a public figure. *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688. Second, Mr. Hutchinson had not thrust himself or his research into a public controversy to influence others. *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688. Finally, the Court pointed out that

**26.** *See Firestone v. Time, Inc.*, 271 So.2d 745, 751 (Fla.1972).

**27.** The Court distinguished Ms. Firestone's activities in the divorce proceeding from the

conduct of General Walker who had been found to be a public figure in *Curtis Publ'g Co. v. Butts*.

the public controversy involved in the case was wasteful public expenditures and that Mr. Hutchinson had at no time asserted a role of public prominence in that debate. *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688.

The second case involved a libel action filed by the nephew of two admitted Russian spies against the author and publisher of a book identifying him as a Russian spy and claiming that he had been indicted for espionage. *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). The author and publisher asserted that Ilya Wolston was a limited purpose public figure because, approximately twenty years earlier, there had been a widespread public concern about Soviet espionage in the United States and because Mr. Wolston had pleaded guilty to contempt for failing to respond to a grand jury subpoena issued as part of an investigation of such activities. The lower federal courts granted the author's and publisher's motion for summary judgment after concluding that Mr. Wolston was a public figure. While the courts agreed that the statement that Mr. Wolston had been indicted for espionage was false, they found that the record contained insufficient evidence, as a matter of law, to prove that the author and the publisher had acted with actual malice.[28]

The United States Supreme Court disagreed with the lower federal courts' conclusion that the plaintiff was a public figure. The Court decided that the evidence did not support the lower court's conclusion that the plaintiff had thrust himself into the forefront of the public controversy surrounding Soviet espionage. Rather, the Court concluded that "[i]t would be more accurate to say that ... [Mr. Wolston] was dragged unwillingly into the con-

troversy." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. at 166, 99 S.Ct. at 2706–07. The Court also noted that the plaintiff had "only a minor role in whatever controversy there may have been concerning the investigation of Soviet espionage." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. at 167, 99 S.Ct. at 2707. Finally, echoing its earlier repudiation of the plurality opinion in *Rosenbloom v. Metromedia, Inc.*, the Court again held that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention.... A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. at 167–68, 99 S.Ct. at 2707.

## C.

In the 1978 case of *Press, Inc. v. Verran*, the Tennessee Supreme Court had the occasion to construe Article I, Section 19 of the Constitution of Tennessee in light of the United States Supreme Court's decisions from *New York Times Co. v. Sullivan* to *Time, Inc. v. Firestone* involving the freedom of speech and the freedom of the press. *Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn.1978). The case involved a libel action filed against a newspaper by a junior social worker employed by the Tennessee Department of Human Services who had been instrumental in removing ten children from their home because of suspected child abuse. The newspaper reported that the children's mother had been "coerced into submitting to sterilization" in order to gain the return of her children. The trial court granted the newspaper's motion for summary judg-

---

28. *Wolston v. Reader's Digest Ass'n, Inc.*, 578 F.2d 427, 431–34 (D.C.Cir.1978); *Wolston v.* *Reader's Digest Ass'n, Inc.*, 429 F.Supp. 167, 179–81 (D.D.C.1977).

ment after concluding that the social worker was a public official and a public figure and that the record contained no evidence that the newspaper had acted with actual malice. This court reversed on the ground that the social worker was neither a public official nor a public figure.

The Tennessee Supreme Court, siding with the trial court, determined that the social worker was a public official. In reaching this conclusion, the court adopted a far more expansive view of "public official" than the one the United States Supreme Court employed in *Rosenblatt v. Baer*. The court observed that "public official" did not apply only to "high public position[s]." Rather, the court concluded that the term applied to "[a]ny position of [public] employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his [or her] enjoyment of life, his [or her] peace and tranquility, or that of his [or her] family." *Press, Inc. v. Verran*, 569 S.W.2d at 441.

The Tennessee Supreme Court also adopted Restatement (Second) of Torts §§ 580A and 580B (1977) after determining that they were consistent with both the First Amendment and Article I, Section 19 of the Constitution of Tennessee. *Press, Inc. v. Verran*, 569 S.W.2d at 442. These Restatement provisions distinguish between public officials and public figures on one hand and private persons on the other. They also apply the *New York Times Co. v. Sullivan* "actual malice" standard to libel actions filed by public officials and public figures. Perhaps to even a greater extent than the United States Supreme Court, the Tennessee Supreme Court based its decision to adopt the "actual malice" standard on the right and the duty of the press to make searching inquiries into and to report on the affairs of govern-

ment and the conduct of public officials. *Press, Inc. v. Verran*, 569 S.W.2d at 442–43; *see also Piper v. Mize*, 2003 WL 21338696, at *9; *Ferguson v. Union City Daily Messenger*, 845 S.W.2d at 167.

The Tennessee Supreme Court also addressed the criteria for determining whether a person is a "public figure." Paraphrasing *Gertz v. Robert Welch, Inc.*, the court held that "public figure" included persons

who have thrust themselves into the vortex of important public controversies; those who achieve such pervasive fame or notoriety that they become public figures for all purposes, and in all contexts; those who voluntarily inject themselves, or are drawn into public controversies, and become public figures for a limited range of issues; and those who assume special prominence in the resolution of public questions.

*Press, Inc. v. Verran*, 569 S.W.2d at 441. The court also noted that determining whether a person is a public figure entails considering the nature and extent of the person's participation in the particular public controversy. *Press, Inc. v. Verran*, 569 S.W.2d at 441.

### D.

Both the United States Supreme Court and the Tennessee Supreme Court agree that the actual malice standard may only be invoked when two conditions have been met. First, the allegedly defamatory statements must involve public controversy or a matter of public or general concern. Second, the person claiming to be defamed must be either a public official or public figure. Both conditions must be satisfied, and if one or both is not, the case must be tried using the liability standard applicable to private persons in Restatement (Second) of Torts § 580B.

### 1.

### The Existence of a Public Controversy or a Matter of Public Concern

The NewsChannel 5 defendants cannot require Brad Lewis to satisfy the heightened actual malice standard unless they can demonstrate that the subject of the August 9, 2000 story involved an important public controversy or a matter of public concern. While the precise boundaries of these concepts are not perfectly demarcated, guidance exists to aid in identifying whether a particular matter involves a public controversy or concern or whether it is a purely private concern. The Tennessee Supreme Court has stated that whether speech "addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Phillips v. State Bd. of Regents,* 863 S.W.2d 45, 51 (Tenn.1993) (quoting *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 1686, 75 L.Ed.2d 708 (1983)).[29]

■■■■ Matters of public concern have "been characterized as those matters as to which 'free and open debate is vital to informed decision-making electorate.'"

*Phillips v. State Bd. of Regents,* 863 S.W.2d at 51 (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 572, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968)). Matters of public concern are "of political, social, or other concern to the community," *Connick v. Myers,* 461 U.S. at 146, 103 S.Ct. at 1690. Located across a disputed and poorly marked border, matters of private concern tend to "fall[ ] into the realm of mere gossip and prurient interest." *Huggins v. Moore,* 94 N.Y.2d 296, 704 N.Y.S.2d 904, 726 N.E.2d 456, 460 (N.Y.1999). They represent an intrusion into the sanctity of private life. Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy,* 4 Harv. L.Rev. 193, 195–96, 216 (1890). Information that is merely of private concern does not, however, have to be of an intimate nature. Rather, it may simply be confidential information that does not add to public discussion or debate on societal questions. *DVD Copy Control Ass'n, Inc. v. Bunner,* 31 Cal.4th 864, 4 Cal.Rptr.3d 69, 75 P.3d 1, 16 (Cal.2003) (concluding that disclosure of highly technical information, classified as trade secrets, does not relate to a matter of public concern because it adds nothing to any public debate regarding the efforts of the DVD industry

29. *Phillips v. State Bd. of Regents* is not a defamation or false light case. It involves the free speech claims of a tenured teacher. However, it is not uncommon for the courts to apply the same principles used to identify speech on matters of public concern in government employee free speech cases to defamation cases. Barry P. McDonald, *The First Amendment and the Free Flow of Information: Towards a Realistic Right to Gather Information in the Information Age,* 65 Ohio St. L.J. 249, 346 (2004). In fact, the courts have used the terminology, a "matter of public concern," in their analysis of a number of free speech issues, including *Connick v. Myers,* 461 U.S. at 142–43, 103 S.Ct. at 1687–88 (free speech rights of government employees); *Bartnicki v. Vopper,* 532 U.S. 514, 532–35, 121 S.Ct. 1753, 1764–1766, 149 L.Ed.2d 787 (2001) (statutory prohibitions against the interception or use of electronic communications); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–63, 105 S.Ct. 2939, 2944–47, 86 L.Ed.2d 593 (1985); *West v. Media Gen. Convergence, Inc.,* 53 S.W.3d at 647 (defamation/false light claims). It is important to recognize, however, that the free speech cases in each of these categories do not arise out of the same context. Therefore, speech that is a matter of public concern in one setting will not necessarily constitute speech on a matter of public concern in another context. Thus, while the law that develops in these various categories of free speech cases can be relevant to elucidating what constitutes "a matter of public concern," the courts should refrain from reflexively applying a determination in one context to another.

to limit the unauthorized copying of DVDs).

While the exact boundaries remain unclear, the report in the present case clearly falls on one side of the map. It relates to a matter of public concern. "Certainly, the question of whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political or social concern." *Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996). Speech that addresses "corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import." *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988). Falling within this realm, public officials using or attempting to use their position to keep friends from receiving tickets or citations, and certainly from being arrested, constitutes a matter of public concern. *See e.g., O'Donnell v. Yanchulis,* 875 F.2d 1059, 1061 (3d Cir.1989); *Scott v. City of Minco,* 393 F.Supp.2d 1180, 1194 (W.D.Okla.2005); *Putnam v. Town of Saugus, Mass.,* 365 F.Supp.2d 151, 168–69 (D.Mass.2005).

There can be no reasonable dispute that the NewsChannel 5 defendants' August 9, 2000 broadcast about Major Dollarhide's disempowerment involved an important public controversy and a matter of genuine public concern. The story was about the discipline of a high ranking police official who had used his official position to prevent a family member from being arrested on serious criminal charges. Abuse of official power, especially by law enforcement officials who are sworn to uphold the law, is precisely the sort of "chicanery" and "skullduggery" that the Tennessee Supreme Court had in mind when it endorsed the actual malice standard. *See Press, Inc. v. Verran,* 569 S.W.2d at 443.

**2.**

### Brad Lewis's Status as a Public Figure

Turning to the second condition, it is equally clear that Brad Lewis was not a public official. Thus, if the NewsChannel 5 defendants are to claim the benefit of the actual malice standard, Brad Lewis must be characterized as a public figure. If he is not a public figure, then he can only be characterized as a private person, and the NewsChannel 5 defendants' civil liability will be governed by Restatement (Second) of Torts § 580B rather than Restatement (Second) of Torts § 580A.

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that a person may become a public figure through no purposeful action of his or her own by being drawn into a particular public controversy. *Gertz v. Robert Welch, Inc.,* 418 U.S. at 345, 351, 94 S.Ct. at 3009, 3013; *Press, Inc. v. Verran,* 569 S.W.2d at 441. A person may be deemed to be an involuntary public figure when his or her conduct is related in an integral and meaningful way to the conduct of a public official.

Justice White made this point in his concurring opinion in *Rosenbloom v. Metromedia, Inc.* He noted that the "[d]iscussion of the conduct of public officials cannot ... be subjected to artificial limitations designed to protect others involved in an episode with officials from unfavorable publicity." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 61, 91 S.Ct. at 1828 (White, J., concurring). According to Justice White, if such limitations were allowed, the public would be deprived "of full information about the official action that took place." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 61, 91 S.Ct. at 1828 (White, J., concurring). He illustrated his point as follows:

In the present case, ... the public would learn nothing if publication only of the fact that the police made an arrest was permitted; it is also necessary that the grounds for the arrest and, in many circumstances, the identity of the person arrested be stated.

*Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 61, 91 S.Ct. at 1828 (White, J., concurring). In other words, "it is rarely informative for a newspaper or broadcaster to state merely that officials acted unless he [or she] also states the reasons for their action and the persons whom their action affected." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 61, 91 S.Ct. at 1828 (White, J., concurring).

 The category of involuntary public figure described in Justice White's concurrence in *Rosenbloom v. Metromedia, Inc.* provides the "breathing" space required by the First Amendment and Article I, Section 19 of the Constitution of Tennessee.[30] To promote vigorous discussion and debate regarding matters of important public concern and the conduct of public officials we would add to Justice White's concurrence that for a private person to become an involuntary public figure, his or her appearance in the story must be an integral and meaningful part of addressing the conduct of the public official with regard to a matter of public concern.

The undisputed facts in this case establish as a matter of law that Brad Lewis should be deemed to be a public figure for the purpose of NewsChannel 5's report regarding Major Dollarhide's official misconduct. He is, to be sure, an involuntary public figure because he did not purposely inject himself into the forefront of the controversy surrounding Major Dollarhide.

However, the NewsChannel 5 defendants had the right to report on Major Dollarhide's disempowerment and on the reasons why the Chief of Police decided to relieve him of his duties. This right necessarily included reporting on the circumstances surrounding Major Dollarhide's intervention to prevent Brad Lewis from being arrested on December 27, 1998. Without these facts, the public would not have been fully and appropriately informed of the seriousness of Major Dollarhide's misconduct.

Had the facts that Brad Lewis believes to be libelous been removed from the NewsChannel 5 story, the public would have been left to speculate about the reasons for the Chief of Police's actions. The public would only have been informed that Major Dollarhide had gone to the scene of an incident where a person was being detained and that he had secured the release of that individual. Based on this information alone, the public would have no way of assessing what Major Dollarhide's motivation had been or whether Major Dollarhide was being disempowered for an adequate or inadequate reason. Even if the public had assumed that Major Dollarhide had acted improperly in some way, it would have no way of ascertaining how serious his misconduct was.

The fact that Brad Lewis was the person involved in the incident that led to Major Dollarhide's disempowerment sheds significant light on Major Dollarhide's conduct. The fact that Brad Lewis allegedly had firearms, betting slips, and a large amount of cash in his possession when he was detained dramatically emphasizes the seriousness of Major Dollarhide's misconduct. These facts removed ambiguity

---

30. *See also Brewer v. Memphis Publ'g Co., Inc.,* 626 F.2d 1238, 1257–58 (5th Cir.1980); *Wiegel v. Capital Times,* 145 Wis.2d 71, 426 N.W.2d 43, 49–50 (1988); Laurence H. Tribe, *American Constitutional Law* § 12–13, at p. 880 (2d ed.1988); David A. Anderson, *Libel and Press Self-Censorship,* 53 Tex. L.Rev. 422, 450–451 (1975).

from the story. They informed the public that Major Dollarhide had intervened to prevent a family member from being arrested for serious criminal offenses. By reporting these facts, the NewsChannel 5 defendants enabled the public to better understand Major Dollarhide's corrupt motivation, as well as the seriousness of his breach of his official duty.

■ An involuntary public figure, such as Brad Lewis, may simply be an unfortunate victim of circumstance pulled into the whirlwind caused by a public official's allegedly improper conduct. However, to have the presence of a private person shield a public official from reports about his or her official misconduct would begin to rot the underlying foundation of the freedoms of speech and of the press laid in *New York Times Co. v. Sullivan.* These freedoms protect the right of a democratic people and the media in a democratic society to discuss and debate the actions of public officials. To fail to create the breathing space for necessary reporting on the misconduct of public officials on matters of public concern where a private person is integrally and meaningfully intertwined would be to miss the proverbial forest for the proverbial trees. The actual malice standard is rooted in the ability of the media and the citizens to discuss and debate improper actions of public officials with sufficient breathing space to be free from the chilling effect of civil litigation and damage awards arising from inevitable errors and mistakes. Thus, we respectfully disagree with the trial court and find, as a matter of law, that the undisputed facts demonstrate that Brad Lewis was a public figure with regard to the reports of Major Dollarhide's disempowerment.

### E.

■ Because Brad Lewis is a public figure with regard to the reports regarding Major Dollarhide's disempowerment, his libel claim against the NewsChannel 5 defendants must be measured against *New York Times Co. v. Sullivan's* actual malice standard. Therefore, to withstand the NewsChannel 5 defendants' motion for summary judgment, Brad Lewis must demonstrate that he will be able to prove clearly and convincingly that the NewsChannel 5 defendants acted with actual knowledge that the facts they reported about him were false or that the NewsChannel 5 defendants reported these facts with reckless disregard as to their truth or falsity. Based on the undisputed facts of this case, Brad Lewis will be unable to prove that the NewsChannel 5 defendants prepared or broadcast the August 9, 2000 story with actual malice.

■ The concept of "actual malice," as embodied in *New York Times Co. v. Sullivan,* should not be confused with the concept of "malice" that connotes personal ill will, hatred, or spite. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991); *Tomlinson v. Kelley,* 969 S.W.2d at 405. Rather, it is shorthand for the constitutional principles that protect speech that might be injurious to a public official's or public figure's reputation. More precisely, the term "actual malice" refers to the publication of a statement with knowledge of falsity or with reckless disregard as to truth or falsity. *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 726.

The undisputed facts of this case do not imply, let alone establish, that the NewsChannel 5 defendants included facts about Brad Lewis in the August 9, 2000 story regarding Major Dollarhide that they knew to be false. Thus, for Brad Lewis's libel claim to survive summary judgment, he must demonstrate that he can present clear and convincing evidence that the

NewsChannel 5 defendants published factual statements about him with reckless disregard about whether they were true or not.

■ Failing to investigate information provided by others before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish reckless disregard. *Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989); *McCluen v. Roane County Times, Inc.,* 936 S.W.2d 936, 941 (Tenn.Ct.App.1996); *Junior–Spence v. Keenan,* No. 89–284–II, 1990 WL 17241, at *5 (Tenn.Ct.App. Feb.28, 1990) (No Tenn. R.App. P. 11 application filed). However, publishing statements when the publisher entertains serious doubts about their truth can amount to reckless disregard. *Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. at 688, 109 S.Ct. at 2696; *Tomlinson v. Kelley,* 969 S.W.2d at 406. This subjective standard requires a "high degree of awareness of . . . probable falsity," *Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. at 688, 109 S.Ct. at 2696 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964)). It may be satisfied when there exists obvious reasons to doubt the veracity of the person who supplied the information or the accuracy of the information itself. *Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. at 688, 109 S.Ct. at 2696 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968)). Thus, while the "failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." *Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. at 692, 109 S.Ct. at 2698 (internal citation omitted).

Viewing the undisputed facts in the light most favorable to Brad Lewis, there is no basis upon which a jury could conclude by clear and convincing evidence that the NewsChannel 5 defendants had actual knowledge of or acted in reckless disregard as to the truth or falsity of the facts about Brad Lewis contained in the August 9, 2000 story. To the contrary, a reasonable jury could only reach one conclusion based on the undisputed facts—that the NewsChannel 5 defendants did not act with knowledge of falsity of the facts they reported, or with reckless disregard as to the truth or falsity of these facts.

Mr. Williams received three anonymous telephone calls from persons identifying themselves as police officers providing information about Major Dollarhide's intervention to prevent Brad Lewis from being arrested. One of these callers provided detailed information about the incident and gave Mr. Williams the name of Officer Dunn, the officer who had stopped and detained Brad Lewis. Mr. Williams personally interviewed Officer Dunn. Officer Dunn confirmed that he had stopped Brad Lewis, and also confirmed most of the other information that had been passed along by the previous callers.

Mr. Williams did not stop his investigation there. He obtained news footage of the roadblock that had caused Officer Dunn to stop and detain Brad Lewis. More importantly, he obtained from an anonymous source access to the audio tape recordings of Major Dollarhide's radio and telephone communications during the evening of December 27, 1998. These tapes confirmed that Major Dollarhide knew Brad Lewis, that he did not want Brad Lewis arrested, and that Brad Lewis possessed firearms when he was arrested. Nothing on these tapes was inconsistent with the information Mr. Williams had al-

ready obtained from Officer Dunn or from the another anonymous police officers.

Brad Lewis insists that he presented testimony from other police officers that undermines Officer Dunn's description of the December 27, 1998 incident. Even if this were true, it is irrelevant with regard to the question of whether the NewsChannel 5 defendants acted with reckless disregard of the truth when they aired the August 9, 2000 story. Brad Lewis himself concedes that Mr. Williams was unaware of these other police officers when he broadcast his story on August 9, 2000. Even if we were to assume that these two officers might have cast doubts on the accuracy of Officer Dunn's account, both the Chief of Police and the head of the Office of Professional Accountability had stated that the allegations regarding Major Dollarhide's conduct during the December 27, 1998 incident were serious—serious enough to warrant Major Dollarhide's disempowerment.

■ The hurdle that Brad Lewis cannot overcome is that he has failed to present any evidence that the NewsChannel 5 defendants purposely avoided the truth or had obvious reason to doubt the veracity of their sources of the information contained in the August 9, 2000 story. Reduced to its essence, Brad Lewis's case boils down to his insistence that the NewsChannel 5 defendants could have conducted a better investigation before they aired the August 9, 2000 story. This sort of claim, even if true, simply cannot withstand the rigors of the actual malice standard. Accordingly, based on this record, we find that Brad

Lewis has failed to present clear and convincing evidence by which a jury could conclude that the NewsChannel 5 defendants acted with actual knowledge of the falsity or with reckless disregard as to the truth or falsity of the statements about him in the August 9, 2000 report. Accordingly, the trial court properly granted the summary judgment dismissing Brad Lewis's libel claim.[31]

## V.

### BRAD LEWIS'S FALSE LIGHT INVASION OF PRIVACY CLAIM

Brad Lewis also takes issue with the dismissal of his false light invasion of privacy claim. He contends that the trial court erred by applying the actual malice standard to this claim because he is a private person and because the December 27, 1998 incident at the roadblock was a matter of private concern. The News-Channel 5 defendants argue that the trial court did not err by granting the summary judgment because Brad Lewis failed to provide evidence of either actual malice or negligence. We have determined that the trial court properly applied the actual malice standard to Brad Lewis's false light invasion of privacy claim and that the trial court did not err by granting the News-Channel 5 defendants' motion for summary judgment.

### A.

While a number of states have eliminated the tort of false light invasion of privacy ("false light"),[32] Tennessee, like a majority

---

31. The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result. *Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn.1986); *Shutt v. Blount*, 194 Tenn. 1, 8, 249 S.W.2d 904, 907 (1952); *In re Estate of Jones*, 183 S.W.3d 372, 378 n. 4 (Tenn.Ct.App.2005); *Shoemake*

*v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 577 (Tenn.Ct.App.2003).

32. *Renwick v. News and Observer Publ'g Co.*, 310 N.C. 312, 312 S.E.2d 405, 413–14 (1984); *Cain v. Hearst Corp.*, 878 S.W.2d 577, 579 (Tex.1994).

of states, still recognizes false light "as a distinct, actionable tort." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn.2001).[33] As for the contours of a false light claim, the Tennessee Supreme Court has adopted much, but not all, of the delineation set forth in Restatement (Second) of Torts § 652E (1977). The Restatement describes the tort of false light as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E, at 394. The standard set forth in subsection (b) mirrors the actual malice standard employed in *New York Times Co. v. Sullivan.*[34]

In Tennessee, the actual malice standard applies to "false light claims when the plaintiff is a public official or public figure, or when the claim is asserted by a private individual about a matter of public concern." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d at 647.[35] Consciously departing from the Restatement which applies the actual malice standard to all false light claims,[36] the Tennessee Supreme Court excluded from this heightened standard "false light claims brought by private plaintiffs about matters of private concern." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d at 647. In such cases, a negligence standard applies. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d at 647–48; *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412 (Tenn.1978).

**B.**

We have already determined in Section IV that Major Dollarhide's disempowerment is a matter of public concern and

---

**33.** *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d at 644 (noting that a "majority of jurisdictions addressing false light claims have chosen to recognize false light as a separate actionable tort."); Nat Stern, *Creating a New Tort for Wrongful Misrepresentation of Character*, 53 U. Kan. L.Rev. 81, 91 (2004) (stating that "false light remains a valid cause of action in a majority of states.").

One reason for the elimination of this tort in some states is the overlap between false light and defamation. While noting this overlap, the Tennessee Supreme Court, nevertheless, determined that "the differences between the two torts warrant their separate recognition." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d at 645. Specifically, the Court indicated that "situations may exist in which persons have had attributed to them certain qualities, characteristics, or beliefs that, while not injurious to their reputation, place those persons in an undesirable false light." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d at 646.

**34.** The United States Supreme Court applied the *New York Times Co. v. Sullivan* actual malice standard to false light claims in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

**35.** *See also Flatt v. Tenn. Secondary Schs. Athletic Ass'n*, 2003 WL 61251, at *3; *Gunter v. Emerton*, No. M2001–00364–COA–R3–CV, 2002 WL 1015808, at *2 (Tenn.Ct.App. May 21, 2002) (No Tenn. R.App. P. 11 application filed).

**36.** Restatement (Second) of Torts § 652E (b), at 394; *see also* Sean M. Scott, *The Hidden First Amendment Values of Privacy*, 71 Wash. L.Rev. 683, 728 n. 282 (1996). The Restatement, however, did not make this application without a caveat and comment. *See generally* Restatement (Second) of Torts § 652E cmt. d, at 398–99.

that, with specific regard to the reports concerning Major Dollarhide's disempowerment, Brad Lewis is a public figure. Therefore, Brad Lewis's false light claim is not one brought by a private person about a matter of private concern. Accordingly, the trial court correctly determined that Brad Lewis's false light claim must be measured against the heightened actual malice standard under Restatement (Second) of Torts § 652E(b).

Similarly, we have also already determined in Section IV that Brad Lewis has failed to demonstrate that he will be able to prove clearly and convincingly that the NewsChannel 5 defendants acted with actual malice in the investigation or broadcast of the August 9, 2000 story. The record contains no evidence that the NewsChannel 5 defendants knew that the information about Brad Lewis contained in the broadcast was false or that they acted with reckless disregard of the truth or falsity of the information. Despite extensive discovery, Brad Lewis was unable to present any evidence that, at the time of the August 9, 2000 broadcast, there were obvious reasons for the NewsChannel 5 defendants to doubt the veracity of the police informants or the accuracy of the information they provided. In the absence of clear and convincing evidence of a high degree awareness on the part of the NewsChannel 5 defendants of the probable falsity of the information in their August 9, 2000 report, Brad Lewis's false light claim must meet the same fate as his libel claim. It must be dismissed.

## VI.

We affirm the summary judgment dismissing Brad Lewis's claims against the NewsChannel 5 defendants and remand the case to the trial court for whatever other proceedings consistent with this opinion may be required. We tax the costs of this appeal to Brad Lewis and his surety for which execution, if necessary, may issue.