RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

PAULA ANN MILLIGAN; HAROLD
MONTGOMERY MILLIGAN,

        *Plaintiffs-Appellants,*

    *v.*

UNITED STATES OF AMERICA; US MARSHALS
SERVICE; METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE; DANIEL THOMAS SHELTON;
UNKNOWN US MARSHAL #3; UNKNOWN US
MARSHAL #4, Individually and as Officers or
Agents of the United States Marshals Service
and/or Metropolitan Government of Nashville
and Davidson County, Tennessee; JOHN DOES
I-X, are presently unknown Agents,
Employees, Servants of Defendants United
States Marshal Service, Metro Government of
Nashville and Davidson County, Tennessee
and/or WZTV-Fox Network; KEVIN COBACK;
C. REESE; W. TERRY; SINCLAIR TELEVISION
OF NASHVILLE, INC., dba WZTV Fox News
("Fox") Network,

        *Defendants-Appellees.*

No. 10-5615

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 07-01053—Aleta Arthur Trauger, District Judge.

Argued: October 13, 2011

Decided and Filed: March 5, 2012

Before: MOORE and COLE, Circuit Judges; BECKWITH, District Judge.[*]

_____

[*] The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Andy L. Allman, KELLY, KELLY & ALLMAN, Hendersonville, Tennessee, for Appellants. Patricia A. Foster, FROST BROWN TODD LLC, Cincinnati, Ohio, Michael L. Roden, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellees. **ON BRIEF:** Andy L. Allman, KELLY, KELLY & ALLMAN, Hendersonville, Tennessee, Andrew C. Clarke, Memphis, Tennessee, for Appellants. Patricia A. Foster, Richard M. Goehler, FROST BROWN TODD LLC, Cincinnati, Ohio, Michael L. Roden, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellees.

---

**OPINION**

---

COLE, Circuit Judge. Plaintiffs Paula and Harold Milligan appeal the orders of the district court granting the United States's motion to dismiss for lack of subject matter jurisdiction and Sinclair Broadcasting's motion for summary judgment. We AFFIRM the judgment of the district court.

## I. BACKGROUND

In October 2006, law enforcement officials across twenty-four states conducted Operation Falcon III ("the Operation"), a week-long fugitive round-up that led to the arrest of 10,733 people. During the Operation, the U.S. Marshals Service ("the Marshals") worked in conjunction with local law enforcement officers to locate and apprehend individuals wanted on federal, state, or local felony warrants. In Nashville, the Marshals worked with officers at the Metropolitan Nashville Police Department ("Metro"), who were specially deputized as U.S. Marshals for the Operation. Plaintiff Paula Milligan was among the numerous arrestees. It is undisputed that, due to a series of clerical mistakes, police arrested the wrong person.

In preparation for the Operation, Metro's Warrants Division received all the outstanding warrants for processing. A data entry clerk received the warrants and entered each suspect's name and identifying information into a spreadsheet, and this

information was later used to create arrest folders for use during the Operation. One of these warrants was for "Paula Milligan a.k.a. Paula Rebecca Staps,"("Milligan/Staps") a five-foot, three-inch, twenty-four-year old white female with brown hair and blue eyes, and a North Carolina driver's license and address. Rather than manually entering all this information, the clerk responsible for processing the warrant first looked her up in the Master Name Index, a database containing information of individuals already in Metro's system. When the clerk processed the warrant for "Paula Milligan a.k.a. Paula Rebecca Staps," he searched for "Paula Milligan" and, because an entry existed, allowed the database to autofill all of Paula Milligan's identifying information. Unknown to the clerk, this personal information actually belonged to a different Paula Milligan—the Plaintiff, a five-foot, six-inch, forty-two-year old white female with blond hair and brown eyes, and a Tennessee driver's license and address. This Paula Milligan's information appeared in the index because of a traffic ticket she received a few years prior to the issuance of the warrant. The clerk failed to cross-reference the physical description given on the warrant with the description already in the index, and this mistake caused Milligan's date of birth and driver's license number to be linked to the outstanding warrant for Milligan/Staps.

Metro then sent this completed spreadsheet to the Marshals, who forwarded it to the Tennessee Bureau of Investigations ("Bureau") to prepare the arrest files. After forwarding the spreadsheet, Metro prepared a second version, removing all individuals with out-of-state addresses since the focus of the Operation was on local cases. This second version was not forwarded to the Bureau, so the Bureau prepared arrest files for local and out-of-state suspects, including one for Milligan/Staps. Because the Milligan/Staps warrant had a North Carolina address and was removed from the second spreadsheet, had the Bureau instead relied on the second spreadsheet, it would not have created this arrest file.[1]

---

[1]In preparing Milligan's arrest file, the Bureau made further investigation and found that she had no criminal record on the national crime database, no outstanding warrants, and no local warrants. This information was entered into a worksheet and placed in her arrest file. The worksheet also asked if the warrant had been confirmed, and Milligan's section was left blank.

On October 24, Officer Doug Anderson and his team arrived at Milligan's home to execute the arrest warrant. Anderson carried a copy of her arrest file, though the file did not contain the warrant. It is unknown whether Anderson reviewed the file, but immediately prior to the arrest, he called a warrant clerk to verify that the warrant was still active. Anderson provided the warrant clerk with Milligan's name and date of birth, and the clerk immediately confirmed that the warrant was active. Given the immediacy of the clerk's response, the Defendants concede that she did not physically locate and review the warrant. Additionally, had she reviewed the warrant, she would have noticed that the date of birth did not match the one Anderson provided. Relying on the clerk's assurance, Anderson and his team arrested Milligan, despite the Milligans' adamant claims of mistaken identity. On November 1, 2006, all criminal charges against Milligan were dropped, as it became clear that she had been erroneously arrested. The court issued a final order confirming the dismissal on November 6, 2006.

Prior to the Operation, the Marshals contacted local media outlets and offered an opportunity to ride along and report on the Operation. WZTV-Fox 17 ("Fox 17"), a local television station operated by Sinclair Broadcasting, accepted. Fox 17 was permitted to ride along on October 24, 2006, but agreed not to air footage until November 2, 2006, after the Operation concluded. On the day of Milligan's arrest, a Fox 17 reporter and videographer accompanied Anderson's team to her home, observing and filming her arrest. The reporter was aware that the officers had an arrest file for Milligan, but never reviewed the contents in preparation for the news story.

On November 2, 2006, the day after criminal charges against Milligan were dropped, the news embargo lifted and Fox 17 was permitted to air its story on the Operation. That day, Fox 17 broadcasted a news story providing general information about the Operation as well as footage of people being arrested and descriptions of their crimes. The report also had interviews with police officers and video footage of two arrests, one of which was Milligan's arrest. The story stated that "[t]heir first arrest came early—Paula Milligan, wanted on four counts of forgery and one count of identity theft" and claimed that the arrests were made "with warrants in hand." The report also

included about seven seconds of video showing Milligan being escorted into the police car. The report also focused on other people arrested during that day, including arrests for drug and sex offenses.

The story originally ran on the news at 9:00 at night and then a shorter version played again an hour later. Fox 17 also placed the video on its website, along with a written story. On November 3, 2006, the Milligans' attorney faxed a cease and desist letter to Fox 17. The letter informed Fox 17 that the police had arrested the wrong person and demanded that Fox 17 stop broadcasting the footage. This letter was the first communication between Milligan and Fox 17 after her arrest, as she had never before contacted the station or any other news source to inform them that her arrest had been an error. Sinclair alleges that, until this letter, at no point did they know of any irregularity or problem with Milligan's arrest. After receiving the letter, Fox 17 stopped broadcasting the story and removed the footage. Although the direct links were removed from the website, due to technical difficulties, the original report was still accessible on the website through a keyword search until November 13.

In October 2007, the Milligans filed federal and state lawsuits against the United States of America, the U.S. Marshals Service, the City of Nashville/Metro, Sinclair Broadcasting, and various named and unnamed Marshals, Metro officers, and Sinclair employees. These lawsuits raised an abundance of federal and state claims, including civil rights violations, defamation, invasion of privacy, false arrest, false imprisonment, and assault and battery. As most claims have been previously resolved, the only issues remaining before this Court are the Federal Tort Claims Act ("FTCA") claim against the United States and the defamation and false light claim against Sinclair Broadcasting. On July 21, 2009, the district court granted Sinclair's motion for summary judgment on the defamation and false light claims. And on September 4, 2009, the district court granted the United States's motion to dismiss the FTCA claims for lack of subject matter jurisdiction. The Milligans timely appeal both of these orders.

II.  ANALYSIS

*A. Motion To Dismiss For Lack Of Subject Matter Jurisdiction Under The FTCA*

The FTCA provides a limited sovereign immunity waiver and subject matter jurisdiction for plaintiffs to pursue state law tort claims against the United States. 28 U.S.C. § 1346(b)(1).  The FTCA waives sovereign immunity where state law would impose liability against a private individual, *Myers v. United States*, 17 F.3d 890, 894 (6th Cir. 1994), and the suit proceeds against the federal government "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see Young v. United States*, 71 F.3d 1238, 1241 (6th Cir. 1995).  The extent of governmental tort liability is "determined in accordance with the law of the state where the event giving rise to liability occurred."  *Young*, 71 F.3d at 1242.

The FTCA, as a limited grant of jurisdiction, excludes certain tort claims from its sovereign immunity waiver.  *See* 28 U.S.C. § 2680.  Because the FTCA is a jurisdictional statute, "[i]f a case falls within the statutory exceptions of 28 U.S.C. § 2680, the court lacks subject matter jurisdiction" and the case must be dismissed. *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir. 1984).  The United States can be sued only to the extent that it has waived its sovereign immunity, so "due regard must be given to the exceptions . . . ."  *United States v. Orleans*, 425 U.S. 807, 814 (1976). Two of these exceptions, the discretionary function exception, § 2680(a), and the intentional tort exception, § 2680(h), are at issue in this case.  The Milligans assert that the district court erroneously analyzed these two exceptions in granting the United States's motion to dismiss.  This Court reviews the district court's decision to grant a motion to dismiss de novo.  *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).

*1. Discretionary Function Exception*

The discretionary function exception insulates the government from tort liability for claims arising from a federal actor's "exercise . . . [of] a discretionary function or duty . . . ."  28 U.S.C. § 2680(a).  The district court found the discretionary function

exception to bar the Milligans' tort claim and, on this basis, granted the United States's motion to dismiss for lack of subject matter jurisdiction. The Milligans, contending the district court erred, maintain that Metro's tortious conduct was not discretionary conduct that falls within the scope of § 2680(a).

To determine whether allegedly tortious conduct falls within the discretionary function exception, this Court applies the Supreme Court's two-pronged *Gaubert* test. *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *United States v. Gaubert*, 499 U.S. 315 (1991)). The first prong requires this Court to determine "whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations." *Gaubert*, 499 U.S. at 328. The focus of this inquiry is on whether the actor had any "element of judgment or choice" in taking his course of action. *Rosebush*, 119 F.3d at 441. "The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee had no rightful option but to adhere to the directive." *Id.* (internal quotation marks omitted). If the actions were made under a mandatory regulation or policy, leaving the actor no judgment or choice in his course of action, then § 2680(a) presents no obstacle to a claim under the FTCA. *See Gaubert,* 499 U.S. at 322; *Rosebush*, 119 F.3d at 441. If, instead, discretionary conduct is involved, then this Court applies the second prong and inquires "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). This second prong seeks to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323.

The crucial first step in deciding whether the conduct was discretionary "is to determine exactly what conduct is at issue," *Rosebush*, 119 F.3d at 441, and identify which specific policies or regulations the plaintiff alleges were violated. The Milligans take issue with Metro's efforts to investigate and execute the Milligan/Staps warrant. They contend that Metro's warrant execution efforts did not involve discretionary acts,

as Metro's Standard Operating Procedures ("Procedures") created mandatory policies which were not followed during the Operation. Metro's Procedures state that "[c]opies of warrants will be used to attempt service," and the Milligans interpret this procedure to require officers to have a copy of the arrest warrant in hand during every warrant execution. The Milligans read this section of the Procedures as a mandatory procedure, leaving the officers without the discretion to choose not to follow it.

The Milligans' reading of this procedure is a misguided characterization of Metro's procedure and takes it out of context. The section immediately following the relevant provision demands that all original warrants remain in the warrants office and delineates the procedure for removal of an original warrant. When the procedure requiring that "[c]opies of warrants will be used to attempt service" is read in conjunction with this subsequent section, the procedure is more aptly construed as forbidding officers from using an original warrant during a warrant execution, and not as an affirmative requirement that officers have a warrant in hand during all arrests. Reading the procedure as a prohibition against using original warrants is also the most practical interpretation. A police department procedure forbidding arrests made without a physically present arrest warrant is implausible. This procedure would force officers to carry copies of all the outstanding warrants just in case the officer encounters a fugitive and it would hamper the police's ability to make legitimate arrests.

As properly interpreted, this procedure does not create a mandatory requirement that Metro officers failed to follow, and so the Milligans cannot rely on it to preclude application of the discretionary function exception. The Milligans do not point to any other federal statutes, regulations, or policies that prohibit or prescribe officer conduct during the investigation and execution of a warrant. Therefore, Metro's actions during the execution of the arrest warrant were discretionary under the first prong of the *Gaubert* analysis.

Finding Metro's actions discretionary, we next inquire, "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. 322-23. This step requires us to determine whether discretionary decisions

made during police investigations and warrant execution are within the scope of conduct the discretionary function exception is intended to protect. In *Mesa v. United States*, the Eleventh Circuit addressed this particular issue in a case also involving an arrest based on mistaken identity. 123 F.3d 1435 (11th Cir. 1997). Similar to Milligan's case, in *Mesa* federal agents executed an arrest warrant for "Pedro Pablo Mesa," and because the plaintiff and suspect share the same name, mistakenly arrested the plaintiff rather than the intended suspect. *Id.* at 1437. The plaintiff filed suit under the FTCA, alleging that the federal agents "failed to properly ascertain the identity of the inhabitants of the Mesa residence prior to service of the arrest warrant." *Id.* at 1438. Finding that the "decisions regarding how to locate and identify the subject of an arrest warrant and regarding whether the person apprehended is in fact the person named in the warrant are discretionary in nature," the court analyzed the policy considerations behind police investigation and warrant execution. *Id.* The court noted that police investigations often involve difficult considerations such as the desire to keep the investigation secret, allocation of police resources, and the urgency of criminal investigations. *Id.* The court further concluded:

> [T]he decision regarding how to locate and identify the subject of an arrest warrant is fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate. . . . [Therefore,] the investigation of the whereabouts and identity of the subject of an arrest warrant . . . is conduct that falls within the discretionary function exception.

*Id.* The *Mesa* court further concluded that the "process of determining whether the person apprehended is actually the person named in the arrest warrant is grounded in considerations of public policy." *Id.* When faced with verifying the arrestee's identity, police must consider the potential danger to public safety of letting the suspect go as well as the possibility that the suspect will destroy evidence or flee. *Id.* "All of these considerations are rooted in policy considerations. Accordingly, we conclude that the discretionary function exception applies to the process of determining whether the person apprehended is actually the person named in the arrest warrant." *Id.*

We agree with the Eleventh Circuit that the process of verifying whether the apprehended person is actually the suspect named in the warrant "is grounded in considerations of public policy," *id.*, and that these policy considerations are "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. As Metro's conduct in investigating and apprehending Milligan was discretionary conduct that § 2680(a) intended to protect, under the *Gaubert* test, it is evident that the discretionary function exception bars subject matter jurisdiction for the Milligans' claims.

### 2. Section 2680(h): Intentional Tort Exception

The intentional tort exception insulates the government from intentional tort liability. 28 U.S.C. § 2680(h). However, there is an exception to this exception. If a federal law enforcement or investigative officer engages in "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution," sovereign immunity is waived and courts have subject matter jurisdiction under the FTCA.[2] *Id.* The district court determined that the federal law enforcement carve out to the intentional tort exception did not provide subject matter jurisdiction to the Milligans' claims because Metro's actions were not intentional torts.

In determining whether the plaintiff's claim falls within the law enforcement exception to the intentional tort exception, we must look to the substance of the claim and not limit our review to how the plaintiff pleaded the cause of action. *See Satterfield v. United States*, 788 F.2d 395, 399-400 (6th Cir. 1986); *cf. Jackson v. United States*, 24 F. Supp. 2d 823, 831 (W.D. Tenn. 1998). A plaintiff may not use semantics to recast the substance of the claim so as to avoid a statutory exception. *See Satterfield*, 788 F.2d

---

[2]We are cognizant of the disagreement among the circuits regarding the interaction between § 2680(a) and § 2680(h). *Compare Nguyen v. United States*, 556 F.3d 1244, 1257 (11th Cir. 2009) ("[We are not persuaded] to abandon our conclusion that if a claim is one of those listed in the proviso to subsection (h), there is no need to determine if the acts giving rise to it involve a discretionary function; sovereign immunity is waived in any event."), *with Gray v. Bell*, 712 F.2d 490, 508 (D.C. Cir. 1983) ("[W]e believe that [the plaintiff] must clear the 'discretionary function' hurdle *and* satisfy the 'investigative or law enforcement officer' limitation to sustain the . . . FTCA claim."); *see also Medina v. United States*, 259 F.3d 220, 224-26 (4th Cir. 2001); *Pooler v. United States*, 787 F.2d 868, 871-72 (3d Cir. 1986). Because the Milligans fail to even state a valid § 2680(h) claim, this Court need not reach this issue.

at 399-400.  In *Satterfield*, the plaintiff framed an intentional assault and battery claim as a wrongful death cause of action, attempting to sidestep the § 2680(h) jurisdictional bar to intentional tort lawsuits against non-law enforcement and investigative federal officers.  *Id.*  The court viewed the "[p]laintiff's wrongful death claim predicated on a negligence theory [as] merely obsfucat[ing] the fact that" it really was an assault and battery claim.  *Id.* at 399.  The court refused to permit the plaintiff's mischaracterization to dictate the boundaries of sovereign immunity.  *Id.* at 399-400.  ("Respondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligen[ce] . . . . Because plaintiff's complaint set forth an intentional tort claim merely sounding in negligence, such claim falls within the exception embodied in § 2680(h) . . . .); *see also Reed v. U.S. Postal Service*, 288 F. App'x 638, 640 (11th Cir. 2008) ("[A] plaintiff cannot avoid the § 2680(h) exclusions by recasting a complaint in terms of a negligent failure to prevent assault or battery. . . . It is the substance of the claim and not the language used in stating it which controls."); *Lambertson v. United States*, 528 F.2d 441, 443 (2d. Cir. 1976) ("In determining the applicability of the [§] 2680(h) exception, a court must look, not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim which he asserts.").

This same logic applies in the opposite direction to a plaintiff's attempt to recast a negligence tort as an intentional tort to take advantage of the law enforcement exception to § 2680(h).  Yet, the Milligans attempt precisely this move by cloaking what is fundamentally a negligence suit in intentional tort suit language.  Even though the Milligans frame their lawsuit as an intentional false arrest claim, they fail to provide even a shred of evidence suggesting law enforcement officers' intent to falsely arrest Milligan.  The facts demonstrate that Milligan's arrest was the product of three negligent acts committed by separate law enforcement actors.  First, the Warrants Division clerk entered the warrant using the automatic fill-in option and, by not cross-referencing the identifying information, mistakenly tied Milligan to the warrant.  Second, Metro sent this data to the Marshals without removing the out-of-state addresses, and this list was forwarded to the Bureau to prepare arrest files.  Third, immediately prior to Milligan's

arrest, another Warrants Division clerk erroneously verified the warrant's validity without actually inspecting it.

At any point, a closer inspection of the warrant may have alerted authorities to their mistakes, preventing Milligan's arrest; however, this failure to use reasonable care may give rise to an action in negligence, not in intentional tort.  The Milligans may not seek the § 2680(h) safe harbor by recasting law enforcement's negligent acts as an intentional tort.  As the law enforcement exception § 2680(h) provides no basis for the Milligans' negligence suit against federal officers, the district court properly granted the United States's motion to dismiss for lack of subject matter jurisdiction.

*B. Motions For Summary Judgment On Defamation And False Light Claims*

The Milligans also brought suit against Sinclair Broadcasting, claiming that Fox 17's Operation report was defamatory and portrayed Milligan in a false light.  The district court granted summary judgment to Sinclair Broadcasting, finding that the Tennessee fair report privilege applied to Fox 17's coverage of the Operation and barred the Milligans' defamation and false light claims.  This Court reviews a district court's grant of a motion for summary judgment de novo, *Himes v. United States*, 645 F.3d 771, 776 (6th Cir. 2011), and the moving party bears the burden of proving that there is no genuine issue of material fact remaining in the suit, Fed. R. Civ. P. 56.

The Tennessee fair report privilege is a qualified privilege that raises the state of mind requirement in both defamation and false light actions to an actual malice standard. *See Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270 (Tenn. Ct. App. 2007); *cf. West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 648 (Tenn. 2001) ("[A]bsolute and conditional privileges apply to the invasion of privacy torts. . . ."). Media defendants benefit from this privilege when reporting on "an official action or proceeding or of a meeting open to the public that deals with a matter of public concern. . . ." *Lewis*, 238 S.W.3d at 285 (quoting Restatement (Second) of Torts § 611, at 297 (1977)).  As the privilege is qualified, not absolute, it applies only when the report is "a fair and accurate summation of the proceeding" and "display[s] balance and neutrality."  *Id.* at 284 (quoting *Smith v. Reed*, 944 S.W.2d 623, 625 (Tenn. Ct. App.

1996)).  Thus, Sinclair Broadcasting may take advantage of the fair report privilege's actual malice standard if it (1) reported on an official action, and (2) provided a fair and accurate report of the events.

We must first determine whether Fox 17's report concerned an official action. The fair report privilege does not protect a media defendant's reporting on all "statements made by any governmental employee in any circumstance," but rather it is limited to reports of "public proceedings or official actions of government that have been made public." *Lewis*, 238 S.W.3d at 285.  The privilege has expanded to include reports of public meetings of local government, reporting on the contents of arrest and search warrants, as well as reports of judicial documents and proceedings. *Id.* at 284-85.  In *Lewis*, a Tennessee court drew a distinction between a media defendant's report of the mere occurrence of an arrest and an arrest report including statements from the police or witnesses discussing the facts of the case. *Id.* at 287.  Looking to the Restatement (Second) of Torts, the court noted:

> [A]n arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer . . . is within the fair report privilege; however, statements made by the police or by the complainant or other witnesses . . . as to the facts of the case . . . are not.

*Id.* (quoting Restatement (Second) of Torts § 611 cmt. h, at 301) (internal quotation marks omitted).  Under this standard, Fox 17's Operation news story is a report of an official action for purposes of the fair report privilege.  The report included only one statement concerning Milligan, asserting that "[t]heir first arrest came early—Paula Milligan wanted on four counts of forgery and one count of identity theft."  This report does not include any opinions or embellishments from third parties and is limited to reporting only "the fact of the arrest [and] the charge of [the] crime." *Id.* at 287.

We must next turn to the issue of whether Fox 17's Operation news report was a fair and accurate portrayal of Milligan's arrest.  The fair report privilege protects only fair and accurate portrayals of the official action; however, a "report need not be a verbatim, technically accurate account in every detail, as long as it conveys a correct and just impression of what took place." *Id.* at 284.  Minor, insignificant factual

discrepancies will not overcome the fair report privilege, but a media defendant may not rely on the privilege when reporting "false statement[s] of fact regarding what occurred during the proceeding . . . or [a] one-sided account of the proceeding . . . ." *Id.*

The Milligans contend that Fox 17's report was not fair and accurate because it erroneously implied that the officers arresting Milligan had a warrant physically present at the time of arrest. The Operation segment opened with the phrase "with warrants in hand, teams of officers swarmed across Middle Tennessee." The report later showed footage of Milligan's arrest and stated that she was arrested on four counts of forgery and one count of identity theft. It should first be noted that the statement "with warrants in hand" is most appropriately viewed as an introductory remark, not commentary on the particulars of Milligan's arrest. But even if this comment is imputed directly to Milligan's arrest, this minor inaccuracy is insufficient to defeat the fair report privilege because it is an insignificant, technical discrepancy. *See id.* The overall gist of the report is that Milligan was arrested on forgery and identity theft charges, and whether the officers physically had a warrant in hand at the time of this arrest or radioed it in to the Warrants Division has no real effect on whether the report conveyed a "just impression of what took place." *Id.* Even though the "with warrants in hand" statement is false as applied to Milligan, it is not such a large transgression that it creates a "one-sided . . . defamatory" account of the official action, and therefore, it is covered by the fair report privilege. *See id.*

Because Fox 17 provided a fair and accurate report of an official action, the fair report privilege requires the plaintiff to prove by clear and convincing evidence that the defendant acted with actual malice. *Id.* at 283. A defendant's defamatory remark is made with actual malice when made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). The Milligans do not contend that Sinclair Broadcasting had actual knowledge that Milligan was erroneously arrested, so the question is whether the report was made with a reckless disregard for the truth. Whether a statement was made with reckless disregard for the truth "is not measured by whether a reasonably prudent man

would have published or would have investigated before publishing, but by whether the defendant in fact entertained serious doubts as to the truth of its publication." *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 526 (6th Cir. 2007) (quoting *St. Amant v. Thompson*, 380 U.S. 727, 731 (1968)) (internal alterations and quotation marks omitted).  In fact, a "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."  *Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

The Milligans are unable to meet their burden of establishing actual malice because their argument solely rests on the Defendant's failure to conduct an independent investigation.  They argue that the reporter should have read the arrest file or conducted independent research on the validity of Milligan's arrest warrant as well as the aftermath of her arrest.  However, the Milligans are unable to provide any evidence suggesting that the reporter "entertained serious doubts as to the truth" of the report, *Compuware Corp.*, 499 F.3d at 526, and their contention that a reporter should investigate prior to publication, even when he has no doubts as to the truth, is not a legally cognizable basis for establishing actual malice, *see Connaughton*, 491 U.S. at 688.  Additionally, Tennessee follows the single publication rule, meaning that a plaintiff's cause of action accrues only once, at the time of publication, and later publications do not give rise to additional defamation causes of action.  *See Applewhite v. Memphis State Univ.*, 495 S.W.2d 190, 193-97 (Tenn. 1973).  Because the Operation news story originally aired on November 2, the Milligans' cause of action then accrued.  Any additional publications that occurred due to technical difficulties between November 2 and November 13, after Fox 17 was aware of Milligan's erroneous arrest, are, therefore, not separately actionable under the single publication rule.

Therefore, we conclude that the district court properly found that the Tennessee fair report privilege shields Sinclair Broadcasting's liability for any inaccuracies in their Operation news report regarding Milligan's arrest.  The Milligans were unable to meet their burden under the fair report privilege of proving actual malice, and because no

genuine issues of material fact relating to the defamation or false light claims exist, the district court properly granted Sinclair Broadcasting's motion for summary judgment.

### III.  CONCLUSION

The district court's grants of the United States's motion to dismiss and Sinclair Broadcasting's motion for summary judgment are AFFIRMED.